Argued at Pendleton October 31, 1933; reversed January 2; motion
to recall mandate denied March 20, 1934

HARRIS *v.* SCHNITZER ET AL.

(27 P. (2d) 1010)

*Louis Schnitzer*, of Portland, for appellants.
*J. S. Hodgin*, of La Grande, for respondent.

ROSSMAN, J. The defendants contend that the chattel mortgage mentioned in the above statement is invalid (1) because it constituted, according to their contentions, a conveyance to the mortgagee in trust for the mortgagor; (2) because the parties contemplated, according to the defendants, that the mortgagor should remain in possession of the mortgaged property, sell the merchandise, and employ the proceeds for his own purposes, thereby rendering the portion of the mortgage applicable to the merchandise fraudulent, which resulted, so the defendants argue, in the invalidity of the entire mortgage; and (3) because the mortgage was executed, according to the defendants, with the intention of defrauding Harris's creditors.

A review of the evidence will facilitate an understanding of the above contentions. In the year 1928 Charles E. Harris was the owner of a carpenter or cabinet-maker's shop which he opened in 1921 in the city of La Grande. The title to the lot, with the building standing thereon and occupied by Harris, was vested in him, subject, however, to a mortgage. In 1932 the mortgage was still unpaid and the property's encumbrances were increased by delinquent taxes and city liens. The evidence warrants the belief that the property was worth little if anything above its indebtedness. In the building was Harris's woodworking machinery and a small stock of lumber, moldings, glass, doors and wall board which he kept for sale or for manufacturing purposes. The complaint alleges that at the time it was filed, June 14, 1932, the machinery, equipment and stock of merchandise were worth $2,800. As a witness, Harris admitted having testified in some preliminary proceedings that the merchandise was worth approximately $1,000. Harris and his mother testified that before he could set up his plant he needed financial assistance from his parents, and that, beginning in the year 1921, both his father and mother made frequent advances to him. Both he and his mother testified that in the year 1928, just before Harris underwent treatment in a hospital, he told his mother that he would like to give her a note to evidence the fact that he was indebted to her. His mother thus spoke of this incident: "He was going to the Veterans' Hospital in Portland, to see if they could find out what was the matter with him; we didn't know; and he thought it would be best to have some provision made for us, because otherwise his wife would have gotten all of it, and if anything comes up we haven't got anything to show for what we loaned him." She testified

that the amount was computed thus: ''Mr. Harris and Charlie (the son) and I were down there and Charlie and Mr. Harris made it out and figured about what the items were that made it, and Charlie made it out and signed it up.'' In this manner they determined that the advances aggregated $4,000, and Harris thereupon signed a note, dated December 13, 1928, requiring payment of $4,000 by himself to his mother one year hence. Just before the close of the trial the mother produced a vest pocket memorandum book containing the following entries:

| ''C. E. Harris, det. | to | |
|---|---|---|
| Frank Harris | | |
| Walter Lee | | $    125.00 |
| Neilson & Harris | | |
| note for | | 1,500.00 |
| Cash for | | 500.00 |
| Cash for | | 170.00 |
| Paid on auto | | 900.00 |
| Aug. 1—borrowed | | 400.00 |
| Aug. 6—check for | | 400.00 paid |
| Cash for lot 1924 | | 175.00 |
| | | 3,370.00 |
| April 21, 1928, loaned | | |
| Charlie | Paid | 50.00'' |

She testified that she made these entries in the year 1924 when she had her cancelled checks before her. She was unable at the time of the trial to produce these cancelled checks or any other supporting memoranda. She was also unable to recall the times when the advances were made. The son was likewise unable to recollect any dates. He produced no memoranda recording receipt of any sum from his parents, unless two deposit slips and a page from his ledger, both produced by himself, can be deemed memoranda of

that character. The bank deposit slips bear the name of no depositor, and Harris made no explanation of his possession of them. Apparently they were never used. One is dated April 20, 1923, and, under the head of "Checks as Follows" lists "F. Harris, $25". The other, dated April 23, 1923, under the same head, lists "F. Harris, $170". Harris testified that these two slips indicate receipt of those sums from his father. He swore that the ledger sheet was taken from a set of books which he had previously maintained. The page he offered is dated December 14, 1922, and, under the head of "Notes Payable", there is entered the following item: "F. Harris, $1,500." He made no explanation whatever of the absence of the other items which are needed to aggregate $4,000, but testified that the $1,500 note had never been paid but was included in the $4,000 note. The father did not testify, but the witness explained that his father was "forty miles the other side of Baker", and to a leading question which inquired whether he was "snowed in" answered "yes". The trial was held May 16, 1933.

Harris returned from the hospital to his business in 1928 and resumed management of it. Thereafter neither he nor his parents seemed to concern themselves with the $4,000 note until the occurrence of the incident which took place in 1932, which we shall shortly describe. However, some time after 1928 Harris gave to the La Grande National Bank a statement of his assets and liabilities, which he admitted made no mention of the $4,000 note nor of any debt due to his parents.

In the spring of 1932 Tyre Bros., who subsequently assigned their account of $800 for merchandise sold to Harris to the aforementioned Louis Schnitzer, wrote

to Harris several letters requesting payment of their account, and also threatening to institute action if payment was not forthcoming. Harris testified that "at that time things were pretty close. You could not get money to pay bills with." He answered in the affirmative a question which inquired whether he feared litigation at that time. The plaintiff knew of the inability of her son to pay his creditors, for she testified: "I just knew he could not pay off his bills." These circumstances caused the son to again mention to his mother the 1928 note. April 13, 1932, he and his mother went to an attorney's office where three instruments were prepared: A note for $4,933.33, payable one year hence, the chattel mortgage aforementioned, and a real estate mortgage, both securing the payment of the note. The son and the mother testified that $4,933.33 was the total of the 1928 note together with its accumulated interest and some minor advances that had been made to the son since 1928. The chattel mortgage described all of the tools, fixtures, equipment, lumber and stock of merchandise comprising Harris's business, together with an automobile. The real estate mortgage described the lot occupied by his small factory building. He possessed no other assets. In both mortgages Harris was the mortgagor and his mother the mortgagee. In the note he was the maker, and his mother the payee. Harris signed all three instruments, and thereupon the chattel mortgage was promptly recorded. The mother testified willingly several times that she had not requested any of these papers nor the 1928 note. The chattel mortgage contained this provision:

"Now should default be made   *   *   *   or shall the said Charles E. Harris sell or dispose of, or attempt to sell or dispose of, or remove, or attempt to remove,

out of said county said property or any part thereof, without first obtaining the written consent of the said Mrs. Frank Harris, or suffer the same or any part thereof to be taken on attachment  *  *  *  then it shall be lawful for the said Mrs. Frank Harris  *  *  *  to enter any place or places where the said goods and chattels may be found, and to take and carry away the same, and to sell or dispose of the same at public or private sale.  *  *  *''

The evidence shows that after April 13, 1932, Harris continued in possession of his aforementioned place of business and continued to conduct it in the same manner as he had previously done with the knowledge of his mother. From time to time as he sold merchandise he kept the proceeds and applied them to his own purposes. He testified, however, that he used some of the proceeds for the maintenance of the stock. The amount of sales was not disclosed. Harris maintained no account books whatever at this time. It is clear that his mother did not ask him to maintain any accounts, and it is equally clear that she never requested him to account to her for the proceeds of any sales. Some days prior to May 27, 1932, Harris effected a sale of the aforementioned automobile at the price of $150, and on May 27, 1932, his mother signed an instrument releasing it from the lien of the mortgage. She neither received nor asked for any part of the $150. Harris testified that with that sum of money he paid some of his debts, but could not recall whether he used any part of it for living purposes. At approximately the same time he transferred to one Guy Fuller several of the machines comprising a part of his plant and described in the mortage, in satisfaction of an indebtedness which he owed to Fuller. His mother signed an instrument releasing this property

from the mortgage without requiring any accounting or explanation. She received no consideration whatever for the release. June 8, 1932, Schnitzer instituted an action against Harris upon the assigned account of Tyre Bros., and caused the sheriff of Union county, a defendant in this action, to seize possession of the aforementioned personal property by virtue of a writ of attachment. June 14, 1932, the plaintiff instituted the present action in claim and delivery, alleging herself to be entitled to the immediate possession of the property in the sheriff's possession.

■ The above, we believe, is a fair review of the evidence. No witnesses testified except Harris and his mother. Let us now consider whether this testimony indicates that on April 13, 1932, Harris was indebted to his mother, the plaintiff. The following circumstances, we believe, are especially worthy of note: (1) Although Harris and his mother testified that the alleged debt was created in 1921 and the year or two following, no written record of it was prepared until (a) the son made the aforementioned ledger entry in 1922 showing an indebtedness of $1,500 to his father; (b) the mother made her entries in 1924 in the small booklet; (c) the son in 1928 signed the $4,000 note; and (d) the son, on April 13, 1932, signed the note for $4,933.33. (2) Although Harris testified that he kept a set of books, and although one can reasonably believe that he must have entered his indebtedness in those books, yet he produced only one page of his ledger and this single page reveals an indebtedness of only $1,500 to his father; (3) although the book entries of both the son and the mother indicate that the debt was due to the father, the latter did not testify, and the belated explanation of his absence does not appeal strongly

to one's reason; (4) although the alleged debt had its inception in 1921, no security was taken until Harris's creditors threatened to sue him; (5) the chattel and real estate mortgages were executed upon the suggestion of the debtor and not upon the request of his alleged creditor; (6) the mortgages covered all of Harris's property and rendered him execution-proof; (7) at a time when the alleged debt was in existence Harris wholly failed to mention it in his statements to the bank wherein he listed his assets and liabilities; (8) after the 1932 note and mortgages were executed, Harris continued to conduct his business in the same manner as before, making sales from his stock and employing the proceeds for his own purposes without making, or being required to make, any accounting to his alleged mortgagee.

Comparing the entry upon Harris's ledger sheet with the entry in his mother's booklet, it will be observed that the entries do not harmonize. The only $1,500 entry in the mother's book mentions a note in that amount in favor of Neilson and Harris, while that of the son records a note in that amount payable to F. Harris. Harris's ledger sheet mentions an indebtedness of only $1,500 while that of his mother records an unpaid indebtedness of $3,370. His bank statement, as we have seen, made no mention whatever of an indebtedness to his parents. Transactions of this character whereby one encumbers all of his property with liens in favor of a near relative, thereby rendering himself judgment-proof, are closely scrutinized by the courts when a creditor attacks the transaction, and, since those who effected the transaction have the best access to the proof, the courts look to them to clear up all suspicious looking circumstances: *Marion Automobile Co. v. Brown,* 127 Or. 551 (272 P. 914).

■ Notwithstanding all of these doubt-producing circumstances, we are willing to believe that Harris's parents advanced to him sums of money aggregating possibly $4,000, but we also believe that when the advances were made the parents did not contemplate that the relationship of borrower and lender should be created. They very likely felt, as the mother testified, that it was their duty to help their son get established in business. Very likely they felt certain that the son would some day return to them their money or make it right in some other way. It seems certain that they never intended that their son should pay them if he could not do so conveniently. Apparently they depended upon his honor and his filial duty rather than upon the legal principles whereby a creditor can enforce payment from a debtor. The execution of the 1928 note was prompted by the thought that the son might not survive the hospital treatment which he was about to undergo. It was not prepared as an instrument for use in the event of his survival, but, in the event of his death, to afford a basis for a claim against his estate so that his wife would not take all. Upon his return from the hospital in a condition of good health, no mention was made of the alleged debt until financial difficulties overtook him in the year 1932. In the interval he made his bank statement in which he made no mention of this alleged indebtedness. The debtor-creditor relationship, apparently created by the 1932 note with its two accompanying mortgages, was promptly ignored the moment the pen was lifted which drafted them. For, as we have seen, Harris was left in charge of his property, continued to make sales, and continued to employ the proceeds for his own purposes in the same manner as he had always done. He paid nothing to the plaintiff.

■■ Let us now consider whether the chattel mortgage is a valid instrument in whole or in part. It is true, as the plaintiff argues, that the chattel mortgage confers no express power upon Harris to make sales, and that it authorizes the mortgagee to take charge of the mortgaged property in the event of the sale of any of it without the mortgagee's written consent, but generally the parol evidence rule prevents only those who executed the instrument from showing that the agreement is other than as recited in it, not strangers to it: Wigmore on Evidence (2d Ed.) § 2446. Accordingly, a stranger may show by parol evidence that when the mortgage was executed the mortgagee conferred upon the mortgagor a power of sale (*Fisher v. Kelly,* 30 Or. 1 (46 P. 146); Jones on Chattel Mortgages (5th Ed.) § 404; 5 R. C. L., Chattel Mortgages, p. 436, § 69) or that the parties, by their subsequent treatment of the mortgaged property, conferred such a power: *Greig v. Mueller,* 66 Or. 27 (133 P. 94, 46 L. R. A. (N. S.) 722); *Sabin v. Wilkins,* 31 Or. 450 (48 P. 425, 37 L. R. A. 465); *Aiken v. Pascall,* 19 Or. 493 (24 P. 1039).

■ This court on several occasions has announced and applied the principle that a grant by the mortgagee to the mortgagor of an unlimited power to sell the mortgaged personal property and employ the receipts for the uses of the mortgagor renders voidable the mortgage upon attack by the creditors of the mortgagor: *Greig v. Mueller,* supra; *Aiken v. Pascall,* supra; *Bremer & Co. v. Fleckenstein & Mayer,* 9 Or. 266; *Orton v. Orton,* 7 Or. 478 (33 Am. Rep. 717). Thus, it is apparent, as the circuit court held, that since Mrs. Harris permitted her son to retain possession of the mortgaged property, to sell the merchandise in the same manner as he had always done and use the receipts for his own purposes without making any accounting what-

ever to her, the mortgage, so far as it granted a lien upon the merchandise, was fraudulent as to the creditors of Harris. But the circuit court sustained the validity of the portion of the mortgage which grants a lien upon the machinery, tools and equipment. We believe that the testimony indicates that Mrs. Harris permitted her son to sell the latter property in the same manner as she did the merchandise; that is, as though she possessed no interest in it whatever. She did not require him to consult her before he disposed of this property, and never requested an accounting nor any part of the proceeds. Machinery, fixtures, etc., are not generally kept by tradesmen for purposes of sale, and hence, an authority conferred by a mortgagee upon his mortgagor to sell merchandise does not include power to sell the fixtures. We take note, however, of the decisions wherein courts have held that power conferred by a mortgagee upon his mortgagor to sell the merchandise, without an accompanying duty to account for the proceeds, renders voidable the other parts of the mortgage which affect the fixtures. The courts so holding maintain that a fraudulent intent as to a part of the mortgage vitiates the entire instrument. The authorities are collected in the annotation accompanying *Turk v. Kramer,* 73 A. L. R. 229, p. 293 (138 Okl. 35, 280 P. 266). But we deem it unnecessary to employ this principle because, as we have said, the evidence indicates that the power of sale which the mother conferred extended to all of the mortgaged property.

We pause for a moment to take note of the character of the fixtures and equipment affected by this power of sale and the lack of interest displayed by the mother concerning these sales. The articles which the son sold were a Buick automobile, a power-driven

mortiser, a saw table, an electric drill, a five-horse power motor and a vise. These articles comprised a substantial portion of the machinery and equipment listed in the chattel mortgage. The mother's lack of interest in the son's sale of this property is evidenced by the following portion of an answer which she made to an inquiry requesting her to repeat what her son told her when he asked for the release: "I didn't pay any attention to just what he said." Later, to a similar question, she replied: "I am not testifying at all, because I am not sure of it; I am not sure of that at all. I don't know anything about the automobile being sold, or anything about it." Other answers made by her clearly indicate that she did not familiarize herself with the equipment in the shop before the mortgage was handed to her, and that she took no note of the articles mentioned in the release before she signed it. Her lack of knowledge concerning the shop, its equipment and her son's business compelled her to avow repeatedly her ignorance. In some instances she accompanied her negative answers by explaining that her son rarely mentioned his business.

We quote from *Greig v. Mueller,* supra, the following:

"It is clear that the Vale bank nominally accepted the mortgage to benefit Ford, and thereafter with the tacit understanding permitted him to continue the business unrestrained and for his own benefit. * * * This court has recognized that by agreement or provision in the mortgage the mortgagor may remain in possession of the stock of goods and continue to make sales, strictly accounting to the mortgagee for the proceeds of the sales less the expense of making the sales; but by agreement and connivance, in disregard of the terms of the mortgage, Ford was permitted to use it to ward off his creditors, and yet to proceed to use the

goods exclusively for his own benefit without paying the mortgage debt therefrom. Thus, with the acquiescence of the mortgagee the mortgage became an instrument to hinder and delay creditors, in violation of the terms of the statute. To maintain his preference the mortgagee under such a mortgage must be diligent to require observance of its terms and spirit. This duty is well stated in Sabin v. Wilkins, supra, and in Currie v. Bowman, 25 Or. 364, 35 P. 848. The Vale bank knew Ford was selling at retail and for credit as well as for cash, keeping no account of such sales nor of the receipts therefrom, although by the mortgage both the expense of making the sales and the purchase of new stock were to be made only on approval of the mortgagee. As beneficiary of the mortgage the Vale bank did not require nor receive any monthly account provided for, or payment to it of the receipts from sales, neither did it control the expenditure of the receipts. In fact, it acquiesced in Ford's methods of conducting the business as he pleased, in total disregard of the mortgage or of its requirements and without even keeping an account of his doings.''

■■ Section 63-506, Oregon Code 1930, provides:

''All deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods and chattels, or things in action, made in trust for the person making the same, shall be void as against the creditors, existing or subsequent, of such person.''

Bearing in mind the fact that the note, as we have already indicated, was not intended to create between son and mother the relationship of debtor and creditor, and that the mother conferred upon the son an unlimited power to sell the mortgaged property for his own purposes, we are of the opinion that the mortgage was nothing more than a conveyance to the son in trust for himself, in violation of the section of our code just quoted. We are, therefore, of the opinion that the mortgage must be held invalid. In arriving at these

conclusions, we do no violence to the rule that the findings of the judge who presided over the trial are the equivalent of a jury's verdict, and cannot be disturbed when supported by substantial evidence. There is no conflict in the evidence. The sole issue presented is the legal effect of this uncontradicted evidence.

It follows from the above that the portion of the judgment from which this appeal has been taken must be reversed.

RAND, C. J., BEAN, BELT and KELLY, JJ., concur.