**L. E. SCOTT, Appellant,**

v.

**Allan H. STOCKER, Trustee in Bankruptcy for William Harvey Smith, a sole trader, d/b/a Smith Office Supply, a Bankrupt, Appellee.**

No. 8803.

United States Court of Appeals
Tenth Circuit.
June 16, 1967.

Robert H. Neptune, Bartlesville, Okl., for appellant.

Irvine E. Ungerman, Tulsa, Okl., (Manuel Grabel, Maynard I. Ungerman, William Leiter, and Theodore Payne Gibson, Tulsa, Okl., with him on the brief) for appellee.

Before MURRAH, Chief Judge, HICKEY, Circuit Judge and CHRISTENSEN, District Judge.

CHRISTENSEN, District Judge.

This suit was brought by Allan H. Stocker (appellee), trustee in bankruptcy for William Harvey Smith, a bankrupt, against L. E. Scott (appellant), to avoid an alleged preferential transfer under Section 60(b) of the Bankruptcy Act, 11 U.S.C.A. § 96(b). The district court granted appellee's motion for summary judgment on the issue of liability, the parties stipulated the value of the property which the appellee was held entitled to recover as a preference, and judgment was thereupon entered against the appellant for $27,000, with interest and costs. This appeal is on the issue of liability only, and involves primarily the question whether Oklahoma's Uniform Commercial Code, 12A O.S. 1961, § 1–101 et seq.,[1] was applicable to, and did validate, a transaction entered into prior to the date on which the Code was to become effective.

The facts are undisputed. On December 31, 1962, the bankrupt and his wife executed an installment note payable to the appellant, or order, in the principal sum of $85,904.74. On the same day the bankrupt and his wife executed an instrument denominated "Financing Statement and Chattel Mortgage" under the terms of which they, as mortgagors, mortgaged to the appellant as security for payment of the installment note personal property described as:

"All the items of personal property on hand and used in connection with the operation of the business known as Smith's Office Supply in Bartlesville, Oklahoma, including all the furniture and fixtures, all the stock in trade, wares and merchandise, and all the right of the goodwill of the business."

---

[1]. Among these provisions is the following: "9–205. Use or disposition of collateral without accounting permissible.

"A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral (including returned or repossessed goods) or to collect or compromise accounts, contract rights or chattel paper, or to accept the return of goods or make re- possessions, or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral. This section does not relax the requirements of possession where perfection of a security interest depends upon possession of the collateral by the secured party or by a bailee. Laws 1961, p. 167, S.B. No. 36, § 9–205."

The "Financing Statement and Chattel Mortgage" was duly acknowledged, and both instruments were delivered to the appellant on that day.

On January 4, 1963, the "Financing Statement and Chattel Mortgage" was filed in the office of the County Clerk of Washington County, Oklahoma. Between January 4, and January 15, 1963, a third instrument denominated "Financing Statement" was executed by the bankrupt and the appellant and filed in the office of the County Clerk of Oklahoma County, Oklahoma, on January 18, 1963, which instrument included the above-mentioned property.

On October 28, 1963, the bankrupt was insolvent and in default on the installment note, whereupon the appellant took possession of all of his business assets. At that time the appellant knew that the bankrupt had other creditors and believed that he was insolvent.

On November 18, 1963, the bankrupt filed a voluntary petition and was adjudicated a bankrupt. The appellee was appointed trustee in bankruptcy and instituted this action to recover the business assets which had been transferred by the bankrupt to the appellant. It was alleged by the appellee that the mortgage to the appellant was invalid and that the said transfer of property, therefore, was an unlawful preference avoidable under the Bankruptcy Act.

In answer to the complaint the appellant alleged that the execution and the filing of the "Financing Statement and Chattel Mortgage" and the "Financing Statement" created and perfected a security interest under the Uniform Commercial Code in the property therein described; that because of the default and violation of the conditions of the security agreement by the bankrupt, the appellant had taken possession of the collateral pursuant to the provisions of the Code, and that since the general creditors of the bankrupt were put on notice of the security interest of the appellant from and after the 18th day of January, 1963, the transfer of October 28 was binding as to them and the appellee, the value of the property admittedly being less than the amount of the obligation.

Affidavits, answers to interrogatories, and admissions were filed. Upon motion by the appellee for summary judgment on the issue of liability, the court concluded as a matter of law that the Uniform Commercial Code, adopted by the State of Oklahoma on July 21, 1961, but not to become effective until midnight December 31, 1962, did not govern the validity of the December 31, 1962 mortgage, and that under the Oklahoma Statutes in force on December 31, 1962,[2] the mortgage of the bankrupt to the appellant was invalid and void as against creditors and, therefore, invalid and void as against the appellee. Apparently the Oklahoma Supreme Court had not theretofore passed upon the transitional question, nor, so far as we are advised, has it done so since.

It is uncontroverted that if the validity of the "Chattel Mortgage and Financing Statement" executed December 31, 1962, was governed by the pre-Code law, it would be void and ineffective as a security instrument. This conclusion is required by the former statute [3] and is in

---

2. 46 O.S.1961, §§ 91–94; 15 O.S.1961, § 631 et seq.

3. 46 O.S.1961, § 91.
   "The whole or any portion of a stock of goods, wares and merchandise may be validly mortgaged or pledged by the owner thereof and transferred pursuant to the terms of such mortgage or pledge and disposed of as therein provided, or as otherwise agreed between the parties, to satisfy in whole or in part the debt secured without prior notice to any creditor of the mortgagor or pledgor, and without

being deemed fraudulent as to any such creditor, when the mortgage or pledge is given to secure a debt contracted concurrently therewith, or in renewal or extension of such a debt so secured and is upon items of goods, wares and merchandise consisting of durable goods having a per unit retail sales value at the time thereof of at least Fifty ($50.00) Dollars * * *."
   46 O.S.1961, § 94.

   "Except as provided in Sections 1 and 2 hereof (91 and 92), every mortgage or

harmony with the existing case law to the effect that a security interest in goods daily exposed for sale (other than durable goods having a per unit retail sales value of at least $50) is void as against creditors.[4]

The appellant argues that if it were the intent of both parties to the "Chattel Mortgage and Financing Statement" to be governed by the Uniform Commercial Code not yet in effect, and the contract was to be performed after the effective date, the provisions of the Code may govern. On the other hand, the appellee maintains that the transaction here involved, having been entered into by the parties prior to the effective date of the Code, was governed by prior law, and that the decision of the district court so holding was in accord with similar decisions from other jurisdictions under the Code or similar Uniform Acts.[5]

■ Since this case is here on appeal from a summary judgment, we must assume on the basis of conflicting evidence before the lower court, favorably to appellant's position, that the contracting parties intended the transaction to be governed by the Code provisions which were to become effective the following day. The appellant correctly points out that the cases cited by the appellee in support of his position are distinguishable factually because among other reasons in none of them is there an indication that the parties actually intended that a law not then in force govern their transaction.

■ In the absence of a controlling decision by the state court, a federal district court's interpretation of local state law will be disturbed on appeal only if the appellate court is convinced that the interpretation is clearly erroneous.[6] Despite the distinction between the cases cited and this case, we are not so convinced, especially in view of the fact that statutes such as are here involved are intended not only to govern the rights of parties to a transaction inter se, but to accord protection to third party creditors.

The case of Godfrey v. McArthur, 186 Okl. 144, 96 P.2d 322 (1939), upon which the appellee heavily relies, is distinguishable on its facts. It involved the execu-

other contract lien given or permitted by the owner of goods, wares and merchandise offered or exposed for sale, at retail, in parcels, and contemplating a continuance of the possession of said goods by said owner shall be deemed fraudulent and void."

4. Midwest Production Co. v. Doerner, 70 F.2d 194 (10th Cir. 1934). In accord is the comment under § 9–205 of the Code, 12A O.S.A., which reads at 284:
"This is perhaps the most important section in Article 9. It relaxes the common law restrictions on a security interest in inventory and accounts receivable.
"This changes the previous Oklahoma law. Before the adoption of the Commercial Code, in Oklahoma, as well as in the majority of states, a security interest in goods daily exposed for sale was void as against public policy. Turk v. Kramer, 138 Okl. 35, 280 P. 266, 73 A.L.R. 229 (1929); former 46 Okl.St. Ann. § 94. However, in 1947 the Oklahoma legislature authorized mortgages on durable goods exposed for sale provided that the retail unit value of such goods was at least $50. Former 46 Okl. St.Ann. § 91.

"This also changes the common law rule of Benedict v. Ratner, D.C.N.Y., 45 S.Ct. 566, 268 U.S. 353, 69 L.Ed. 991 (1925), holding that an assignment of an account receivable is void as to a trustee in bankruptcy if the assignor retains control over the account."

5. See, e. g., Boeing Airplane Co. v. O'Malley, 329 F.2d 585 (8th Cir. 1964); James Talcott, Inc. v. Associates Discount Corporation, 302 F.2d 443 (8th Cir. 1962); McCormack v. E. E. McCormack Co., 239 Or. 264, 397 P.2d 198 (1964); Paramount Paper Products Co. v. Lynch, 182 Pa.Super. 504, 128 A.2d 157 (1956).

6. Jamaica Time Petroleum Inc. v. Federal Insurance Company, 366 F.2d 156 (10th Cir. 1966); Bushman Construction Company v. Conner, 351 F.2d 681 (10th Cir. 1965), cert. denied 384 U.S. 906, 86 S.Ct. 1340, 16 L.Ed.2d 358; First National Bank & Trust Co. of Oklahoma City, Okl. v. Foster, 346 F.2d 49 (10th Cir. 1965). See also Stubblefield v. Johnson-Fagg, Inc., 379 F.2d 270 (10th Cir. 1967).

tion of an oil and gas lease on a tract of land not yet zoned to permit oil and gas development. Under the terms of the written contract no consideration was to pass until the tract was zoned for such development. It was urged that the contract was illegal in its inception in that no ordinance existed permitting the drilling of a well on the premises. The court found no merit to the contention, noting that the contract specifically recognized the absence of such an ordinance and was made in anticipation of one in the future authorizing such drilling. In the instant case, the execution of the chattel mortgage contemplated the immediate creation of rights and duties notwithstanding legislation then in force making such a contract void. The rights of creditors not parties to the contract were affected by the contract, the public policy being to protect them by means of existing law. In the *Godfrey* case, rights and duties created under the contract were made contingent upon the happening of an event in the future. Unlike the situation here, there was in existence there no law expressly making such a contract void. Other authorities cited by the appellant in support of the conflicts of law principle that parties may stipulate that the law of a particular jurisdiction shall govern a transaction providing there is sufficient relationship between that jurisdiction and the transaction, furnish little support for the application urged by the appellant in this case.

The appellant argues that there is no prohibition in the Code against contracting prospectively to make the Code the law of the contract. Pertinent sections follow:

"Section 10–101. Effective Date.

"This Act shall become effective at midnight on December 31, 1962. It applies to transactions entered into and events occurring after that date, Laws 1961, p. 181, § 10–101."

"Section 10–103. Provision for Transition.

"Transactions validly entered into before the effective date specified in Section 10–101 and the rights, duties and interests flowing from them remain valid thereafter and may be terminated, completed, consummated or enforced as required or permitted by any statute or other law amended or repealed by this Act as though such repeal or amendment had not occurred. Laws 1961, p. 182, § 10–103."

▮▮ Reading the two sections together, we conclude that for transactions entered into prior to the effective date— midnight December 31, 1962—the law then governing controlled and could be deemed to remain in force; that the parties were not precluded, however, from refinancing the transaction after the effective date of the Code to bring the transaction within its provisions; and that the Code provisions applied to all transactions entered into after the date on which it became effective.

Even if we were to accept the appellant's reasoning that by the use of the word "may" in Section 10–103, the legislature contemplated giving the parties an option to determine which law should govern, it must be noted that the same section requires that the transaction be "validly entered into". At the time of the execution of the security agreement on December 31, 1962, the transaction on its face was not "validly" entered into because under the law then governing it was "void".

▮▮ We see no merit in the appellant's final argument that the financing statement filed on January 18, 1963, was sufficient also as a security agreement. Nowhere in the form is there any evidence of an agreement by the debtor to grant the lender a security interest in the collateral.[7]

Affirmed.

7. See 12A O.S.1961, §§ 9–403, 9–105(1) (h).