R. Anthony DuBAY, Appellant,

v.

Everette H. WILLIAMS, Appellee.

Everette H. WILLIAMS, Appellant,

v.

ROSE CITY DEVELOPMENT CO., Inc., Appellee.

Robert J. DAVIS, Appellant,

v.

Everette H. WILLIAMS, Appellee.

Nos. 22507, 22507-A and 22507-B.

United States Court of Appeals Ninth Circuit.

Aug. 20, 1969.

Don S. Willner (argued) of Willner, Bennett & Leonard, Portland, Or., for appellant DuBay.

Boyd J. Long (argued) of Boyrie, Miller & Long, Portland, Or., and George M. Treister (argued) of Quittner, Stutman, Treister & Glatt, Los Angeles, Cal., for appellee trustee.

Sussman, Shank & Wapnick, Portland, Or., for appellant Davis.

Robert Haydock, Jr., Boston, Mass. (argued) Bullivant, Dezendorf & McKeown, Portland, Or., for amicus curiae Oregon Commissioners on Uniform State Laws.

Severson, Werson, Berke & Bull, James B. Werson, San Francisco, Cal., for ami-

cus curiae National Commercial Finance Conference, Inc.

Before BARNES and HUFSTEDLER, Circuit Judges, and JAMESON,* District Judge.

HUFSTEDLER, Circuit Judge:

Before us are three appeals from orders of the United States District Court for the District of Oregon adjudicating the claims of three creditors asserting security interests in the net proceeds of accounts receivable of the Portland Newspaper Publishing Co., Inc. (the "Bankrupt"). The three creditors are Rose City Development Company, Inc. ("Rose City"), Robert J. Davis, and R. Anthony DuBay. The Referee disallowed all three claims as preferences under section 60 of the Bankruptcy Act, 11 U.S.C. § 96. Petitions for review resulted in orders of the District Court affirming disallowance of the claims of Davis and DuBay reversing disallowance of Rose City's claims,[1] from which orders the parties adversely affected appeal.

The combined appeals present a chromatic scale of questions relating to the interaction of the provisions of the Uniform Commercial Code concerning security interests in accounts receivable and the preference provisions of the Bankruptcy Act.[2] Each of the creditors claims a security interest, good against the trustee in bankruptcy, in the existing and future balances of the Bankrupt's accounts receivable pursuant to security agreements. DuBay's security agreement was executed before the Uniform Commercial Code became effective in Oregon. Davis' security agreement and that of Rose City were executed after the Code became effective.

---

* Hon. William J. Jameson, United States District Court Judge, Billings, Montana, sitting by designation.

1. In re Portland Newspaper Publishing Co. (D.Ore.1967) 271 F.Supp. 395.

2. The questions presented are of such novelty and importance that they have received widespread attention and discussion in the law reviews. *E. g.*, Hogan, "Games Lawyers Play With the Bankruptcy Preference Challenge to Accounts and Inventory Financing," 53 Cornell L. Rev. 553 (1968); Krause, Kripke and Seligson, "The Code and the Bankruptcy Act: Three Views on Preferences and After-Acquired Property," 42 N.Y.U.L. Rev. 278 (1967); Henson, "The Interpretation of the Uniform Commercial Code: Article 9 in the Bankruptcy Courts," 22 U.Miami L.Rev. 101 (1967); Henson, "The Portland Case," 1 Ga.L. Rev. 257 (1967); Henson, "'Proceeds' Under the Uniform Commercial Code," 65 Colum.L.Rev. 232 (1965); Gordon, "The Security Interest in Inventory Under Article 9 of the Uniform Commercial Code and the Preference Problem," 62 Colum.L.Rev. 49 (1962); Friedman, "The Bankruptcy Preference Challenge to After-Acquired Property Clauses Under the Code," 108 U.Pa.L.Rev. 194 (1959); King, "Section 9–108 of the Uniform Commercial Code: Does It Insulate the Security Interest From Attack by a Trustee in Bankruptcy?", 114 U.Pa. L.Rev. 1117 (1966); Kennedy, "The Trustee in Bankruptcy Under the Uniform Commercial Code: Some Problems Suggested by Articles 2 and 9," 14 Rut. L.Rev. 518 (1960); Hogan, "Future Goods, Floating Liens and Foolish Creditors," 17 Stan.L.Rev. 822 (1965); Viles, "The Uniform Commercial Code v. The Bankruptcy Act," 55 Ky.L.J. 636 (1967); Riemer, "Bankruptcy—Preference—Conflict Between Section 9–108 of the Uniform Commercial Code and Section 60(a) of Bankruptcy Act," 70 Comm'l L.J. 63 (1965); Riemer, "The After-Acquired Property Clause Revisited," 70 Comm'l L.J. 334 (1965); Kennedy, "The Impact of the Uniform Commercial Code on Insolvency: Article 9," 67 Comm'l L.J. 113 (1962); Comment, "Toward Commercial Reasonableness: An Examination of Some of the Conflicts Between Article 9 of the Uniform Commercial Code and the Bankruptcy Act," 19 Syr.L.Rev. 939 (1968); Recent Development. "Bankruptcy Preferences—Secured Transactions," 65 Mich.L.Rev. 1004 (1967); Comment, "After-Acquired Property Security Interests in Bankruptcy: A Substitution of Collateral Defense of the U.C.C.," 77 Yale L.J. 139 (1967); Note, "Rosenberg v. Rudnick: An Examination of the Potential Conflict Between the After-Acquired Property Provisions of Article 9 of the U.C.C. and Section 60(a) of the Bankruptcy Act," 15 U.C.L.A.L.Rev. 678 (1968).

The three creditors were closely involved in the short and turbulent life of the *Portland Reporter*, a newspaper, and in the operation of its publisher, the Bankrupt, and the Bankrupt's predecessor, the Portland Reporter Publishing Company, Inc. (the "Reporter"). In November 1959 the Portland Stereotypers Union struck Portland's two dailies, the *Oregonian* and the *Oregon Journal*. Members of other local unions refused to cross the Stereotypers' picket lines. The two dailies joined forces and continued publication of their respective papers despite the strike. The affected local unions organized Reporter to employ their idled workers and to compete with the struck dailies. The Reporter was organized early in 1960 to publish the paper, and, concurrently, the unions incorporated Rose City to acquire the physical plant for Reporter. Rose City acquired and converted a warehouse and leased it to Reporter for its publication base. The financial condition of Reporter, precarious from the outset, steadily deteriorated until, in February 1964, the Reporter announced that it would suspend publication. The announcement touched the pocketbooks as well as the sentiments of the public, producing contributions of $50,000 and temporary loans of another $50,000, which was enough money to keep the newspaper afloat a few months longer. Robert J. Davis, who had recently become a member of Reporter's board, was so heartened by the public response that he agreed to continue his guaranteed bank loan of $25,000 in Reporter's favor and agreed to finance the paper up to $225,000 by buying stock of a corporation (the Bankrupt) into which Reporter could be merged. Reporter thereafter merged into the Bankrupt. Davis bought $156,000 of the Bankrupt's stock between April and September 1964. The paper's financial rally was fleeting. Infusions of capital were inadequate to withstand the mounting drain of operating losses. On September 27, 1964, the board announced the impending cessation of publication and relieved Davis of further

obligation to buy stock. The paper died on September 30, 1964.

On September 28, 1964, Rose City, Davis, and DuBay (who had been a director of Reporter from 1961 to the merger) appointed a representative to collect the accounts receivable which they claimed were subject to their security interests. As of the time of adjudication $107,000 net had been collected from the receivables and was being held by the creditors' trio and the trustee. About two thirds of the collections came from display and classified advertising and the remainder from circulation accounts.

On October 15, 1964, wage claimants filed an involuntary bankruptcy petition against the Bankrupt and four days later it was adjudicated a bankrupt. In addition to the accounts receivable, the assets of the estate amount to about $14,000. Priority claims against the estate total over $54,000, general claims total about $80,000, and the claims here considered are, respectively, for DuBay, $25,000 principal; for Davis, $25,000 principal; and for Rose City, a total of $53,122.26 principal. Davis, DuBay, and Rose City do not here challenge the findings of the Referee that the Bankrupt had been insolvent during the four months prior to October 15, 1964, and that each of them knew or should have known of the insolvency.

### The DuBay Claim

On June 26, 1962, DuBay executed a collateral agreement with the First National Bank of Oregon to secure the payment of a $25,000 loan made to Reporter by the bank. DuBay executed the agreement as an accommodation to Reporter; he received no personal benefit from the transaction. In order to secure DuBay against loss on his collateral agreement, Reporter and DuBay entered into a security agreement on July 31, 1962, under which Reporter agreed to assign advertising accounts receivable to DuBay which DuBay would from time to time select. Attached to the agreement was an executed formal assignment of 62 advertising accounts. The agree-

ment contains the following pertinent provisions:

"WHEREAS, Assignor desires to assign to Assignee accounts receivable which are unpaid but which are due and owing or which will become due for advertising services rendered by Assignor. * * *

"1. The Assignee will from time to time, during the continuance of this agreement, select such accounts receivable as shall total not more than $40,000 at any one time. * * *

"2. Concurrently with such selection the Assignor will, by proper instrument in writing, a form of which is attached hereto, unconditionally assign, transfer and set over to the Assignee, his successors and assigns, all of Assignor's rights, title and interest in said accounts. * * *

" * * *

"7. Any such assignment is for the sole purpose of providing security to Assignee upon his obligation under the agreement heretofore referred to and it is agreed that so long as Assignor is not in default Assignee shall not be entitled to the proceeds from any account periodically collected but the same shall remain the sole property of the Assignor."

At regular intervals after July 31, 1962, as the originally listed accounts were collected, terminated, or returned as uncollectible, the Reporter's controller prepared and submitted memoranda to the board of Reporter and to DuBay listing accounts receivable totaling, at first $40,000, and later $35,000. DuBay's initials were placed next to the respective accounts in Reporter's books. The memoranda were not in the form of assignments or, indeed, in the form of any kind of agreement. The last memorandum in the series was dated April 21, 1964.

The Uniform Commercial Code took effect in Oregon on September 1, 1963. (Ore.Laws 1961, c. 726, § 428.) DuBay and Reporter filed a financing statement on September 30, 1963, showing an as-

signment of accounts receivable and proceeds to DuBay.

On February 27, 1964, DuBay gave written notice of termination of the Bankrupt's agency for collection of the advertising receivables in which he claimed a security interest. From February 27, 1964, to March 6, 1964, DuBay and other creditors claiming a security interest in the receivables collected the accounts. On the latter date Davis, DuBay, and Reporter entered an agreement affirming their prior agreements, releasing the sums collected on the accounts to Reporter, and renaming Reporter as their agent for collecting the accounts. On April 22, 1964, Reporter was merged into the Bankrupt and the Bankrupt assumed all of Reporter's rights and obligations. DuBay declared default and again terminated the agency for collection on September 28, 1964. Thereafter he collected directly from the debtors whose accounts he claimed had been assigned to him.

█ DuBay contends that he has a security interest, valid against the trustee, in the existing and future balances of the accounts of advertising debtors listed in the memorandum of April 21, 1964. To support that contention DuBay argues that the memorandum and the security agreement underlying it was an assignment of the fluctuating balances of the future accounts the validity of which should be tested under the Commercial Code. Because the memorandum, standing alone, is neither an agreement nor an assignment, DuBay must pin the memorandum to a security agreement. The only security agreement he had was the contract of July 31, 1962. His threshold difficulty is that the memorandum, generously construed in the light of the parties' conduct, is not an assignment contemplated by the 1962 agreement, in form or in substance. But even if DuBay could cross that threshold, he cannot thereby advance to 1964 an agreement executed in 1962 and thus subject the 1962 agreement to the provisions of the Commercial Code.

If the memorandum were an assignment within the meaning of the 1962 agreement, it relates back to the contract from which it derived its vitality. The assignment stands or falls on the validity of the 1962 agreement of which it is an integral part. The 1962 agreement is felled by the pre-Code rule of Benedict v. Ratner (1925) 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, holding that a transfer of property as security which reserves to the transferor the right to dispose of it, or to apply its proceeds to his own uses, is fraudulent as to creditors and void. Paragraph 7 of the 1962 contract gave Reporter unfettered control over the security and thereby invalidated the contract under the pre-Code Oregon rule following Benedict. (*E. g.*, Harris v. Schnitzer, 146 Or. 391, 27 P.2d 1010 (1934); Scandinavian-American Bank v. Sabin (9th Cir. 1915) 227 F. 579; 4A Collier, Bankruptcy § 70.77, at 840-79 (14th ed. 1967).)

Section 70e of the Bankruptcy Act (11 U.S.C. § 110e) provides that a security agreement which is fraudulent as to any creditor having a provable claim is void as to the trustee. The Referee found that there were two such creditors of Reporter and accordingly held the assignment to DuBay void as to the trustee.

The invalid security agreement was not validated by the filing of financing statements by Reporter and DuBay after the Code became effective. In adopting the Uniform Commercial Code, the Oregon Legislature provided that the Code "applies to transactions entered into and events occurring on and after that date [September 1, 1963]" and that "Transactions validly entered into before the effective date * * * remain valid thereafter and may be terminated, completed, consummated or enforced as required or permitted by any statute or other law amended or repealed by this Act as though such repeal or amendment had not occurred." (Ore.Laws 1961, c. 726, §§ 427–28.)

The transaction from which any claimed security interest stemmed was the 1962 agreement. None of the acts of the Bankrupt or its predecessor and DuBay did more than to reaffirm and to execute the provisions of that agreement. Nothing in the provisions of the Act adopting and applying prospectively the Uniform Commercial Code remotely suggests an intent of the Oregon Legislature to revive and to validate a contract entered before September 1, 1963, fully executed or not, which was invalid under pre-Code law. We hold that the 1962 security agreement was void as to the trustee. (Scott v. Stocker (10th Cir. 1967) 380 F.2d 123.)

### The Davis Claim

Robert J. Davis, at Reporter's request, executed a guarantee of a $25,000 loan made by the First National Bank of Oregon to Reporter and gave the Bank collateral in the form of an assigned savings account on December 13, 1963. On the same date Reporter and Davis executed a security agreement the terms of which were virtually identical to that executed by DuBay and Reporter. Attached to the security agreement is an express assignment of designated accounts then existing together with their balances. A financing statement covering "accounts receivable and proceeds" was promptly filed by Davis. Thereafter no formal assignment of accounts was ever made. Reporter and Davis followed the same procedure as did DuBay. A series of memoranda was prepared by Reporter's controller and sent to the board, to Davis, and to Davis' lawyer, and Davis' initials were placed next to the named display accounts on the ledger sheets. The last memorandum, dated April 21, 1964, named certain display accounts with their respective amounts totaling $16,247.42, and unspecified circulation accounts totaling $18,752.58. The memorandum was typed and was not formally executed. The controller's name was also typed. No longhand signatures were affixed. No words of assignment or agreement appear on the memorandum of April 21 or its predecessor memoranda. Nothing at all

is stated on the memoranda about future charges to the listed accounts or to future accounts.[3]

The Referee disallowed Davis' claimed security interest in the accounts listed on the April 21 memorandum as a voidable preference on the ground that the memorandum, read with the security agreement of December 13, 1963, did not comply with the minimum requirements for a perfected security interest in future accounts receivable contained in the Commercial Code. The District Court agreed with the Referee.

On appeal Davis contends that he had a valid security interest in the accounts listed in the memorandum of April 21, 1964, and that his security interest was not subject to avoidance by the trustee under section 60 of the Bankruptcy Act. His alternative contention, in the event he loses his primary position, is that he has a valid security interest in the balances, as of April 21, 1964, of the accounts listed in the assignment annexed to the December 13 agreement because that assignment gave him an enforceable security interest in future fluctuating balances in the accounts listed in the 1963 assignment which were surviving on the April 21, 1964, list.

■ For the purpose of discussing his primary contentions we assume that the security agreement of December 13, 1963, together with the formal assignment of the accounts of the same date gave Davis a security interest in the balances of the accounts designated, which interest was perfected upon filing. But the security agreement without the formal assignment did not give Davis a security interest in accounts receivable, present or future, because the accounts receivable subject to the agreement cannot be defined by that instrument standing alone. The agreement expresses the parties' intent that affirmative action beyond the signing of the agreement was required to designate the accounts: Davis was to select the accounts and concurrently the Bankrupt was to execute an unconditional assignment of the selected accounts "by proper instrument in writing, a form of which is attached hereto." Under these circumstances the agreement does not itself contain "a description of the collateral" within the meaning of Ore. Rev.Stat. § 79.2030(1) (b) [U.C.C. § 9–203(1) (b)].[4]

If Davis ever acquired a security interest in the accounts he claims, that interest must be defined by another document completing the 1963 agreement, or by another document which itself constitutes a security agreement. On this leg of Davis' agreement the only docu-

---

3. The memorandum of April 21, 1964, was in the following form:

"April 21, 1964

Memo to: The Board of Directors of the Portland Newspaper Publishing Co., Inc....and Robert J. Davis
From: Keith W. Platner, Controller
Re: Accounts Receivable Assignment to Robert J. Davis
The following list of accounts receivable taken as of April 21, 1964, is to show the current standing of the original assignment of these accounts November 30, 1963, and February 24, 1964, RJD.

| Account Name | Amount as of April 21, 1964 |
|---|---|
| [Here appear names of accounts and balances as of April 21, 1964] | |
| Circulation A/R | $18,752.56 |
| | $35,183.75" |

---

4. The Davis agreement encompasses less than all of the Bankrupt's accounts receivable; therefore, National Cash Register Co. v. Firestone & Co., Inc. (1963) 346 Mass. 255, 191 N.E.2d 471, 1 UCC Rep. 460, does not aid him. In the cited case the security agreement covered the business at a stated address "together with all its good-will, fixtures, equipment and merchandise." The court held that the creditor had a security interest in the cash register because "all" meant "all" fixtures and equipment.

ment to which he points is the memorandum of April 21, 1964. That document is not an assignment or agreement complying with the 1963 agreement and is not, standing alone, a security agreement.

The memorandum does not meet the specifications of the 1963 agreement. Davis argues that these deficiencies in the memorandum should be ignored because the parties in dealing with each other ignored the provisions of that agreement and intended the memorandum to be an effective designation of accounts. There might well be substance in this argument were we dealing only with the rights of Davis, a public-spirited citizen, and the newspaper he tried to save. But the setting is bankruptcy and the rights of third persons have intervened. Even though the parties may have been motivated more charitably than commercially, their acts must be tested by the standards of the commercial world. By those standards in this setting the memorandum fails. (*Cf.* Safe Deposit Bank and Trust Co. v. Berman (1st Cir. 1968) 393 F.2d 401.)

The memorandum alone is not a security agreement. A "security agreement" is defined as "an agreement which creates or provides for a security interest." (Ore.Rev.Stat. § 79.1050(1) (h) [U.C.C. § 9–105(1) (h)].) The memorandum contains no words of creation or grant. (American Card Co. v. H.M.H. Co. (1963) 97 R.I. 59, 196 A.2d 150; Scott v. Stocker, *supra,* 380 F.2d 123.

There remains Davis' contention that the December 13 agreement together with the formal assignment of the same date created a security interest in the designated accounts not only in respect of their then stated balances, but also of the future balances of those accounts which were not deleted by the later memoranda. The contention fails because those instruments do not contain any words which import an intention to give a security interest in after-acquired property and the language used

is not consistent with such an intent. The only words available to Davis are references to "accounts receivable." The word "account" is defined in the Oregon Commercial Code, unless the context otherwise requires, as "any right to payment for * * * services rendered which is not evidenced by an instrument or chattel paper." (Ore.Rev.Stat. § 79.-1060(1) [U.C.C. § 9–106(1)].) The implication is that a future charge is not an "account," because the services have not yet been rendered. But apart from any technical definition of terms, the agreement simply cannot be squared with an intent to make a present transfer of the future balances or charges to the listed accounts. The agreement says that Davis "will from time to time, during the continuance of this agreement select such accounts receivable as shall total * * * $35,000 * * *" and that Davis could reassign an account and select another "to be assigned." The Referee, the District Court, and we read these words the same way: The parties intended any future accounts and balances to be added by later assignments; there was no intent presently to assign future balances in those accounts. It is obvious that the parties did not draft the agreement and the assignment with the provisions of the Commercial Code in mind. They could have done so, but they did not, and we cannot draw for them an agreement they did not draw for themselves.

In view of our disposition of these issues, it is unnecessary to consider the remaining contentions concerning Davis' claim.

### The Rose City Claim

Rose City lent Reporter $45,000 on November 16, 1963, and $10,300 on November 22, 1963, for which Reporter executed two promissory notes in Rose City's favor. To secure the loans the parties entered into a security agreement dated November 22, 1963, by which Reporter assigned to Rose City a security interest in all of its accounts receivable "now existing or hereafter arising,"

other than those accounts assigned to Du-Bay and Davis. A financing statement was filed on November 26, 1963. The security agreement did not contain any provision for Rose City's policing the accounts.[5]

When Reporter was merged into the Bankrupt, the Bankrupt took over all of the Reporter's assets and assumed Reporter's liabilities. The Bankrupt did not itself enter a security agreement with Rose City and no financing statement was thereafter filed reflecting Reporter's metamorphosis.

On the date of the Bankrupt's adjudication, there was owed $42,822.26 on the $45,000 note and the full amount of the $10,300 note. The Referee held that Rose City's security interest in the accounts receivable did not come into existence until four months prior to bankruptcy and was a voidable preference under section 60. The District Court disagreed with the Referee and held that Rose City's security interest in the Bankrupt's after-acquired accounts receivable did not result in preferential transfers. The trustee appeals from the District Court's order reversing the Referee's order disallowing Rose City's claim.

■ Before reaching the issues decided by the District Court we dispose of two contentions by the trustee: Rose City did not have a valid security interest because it failed to execute a new security agreement with the Bankrupt after the merger, and it failed to file a new financing statement after the merger. Neither of these contentions was raised before the Referee or the District Court. We will not consider on appeal contentions not presented below when additional evidence could have been offered to rebut those contentions had they been earlier made. (*See* Fortner and Perry, Inc. v. Smith (9th Cir. 1964) 327 F.2d 801; Briskin v. White (9th Cir. 1961) 296

F.2d 132.) The trustee conceded at oral argument that the failure of the trustee to raise these issues before the Referee and the District Court thwarted the presentation of available rebutting evidence.[6] Therefore, we do not decide the merits of these contentions. For the purpose of the appeal we treat the security agreement as if it had been executed by the Bankrupt and the filing as if it had been made after the merger.

Can the trustee set aside as preferential Rose City's security interest in these accounts receivable which arose within four months of bankruptcy? Is there an unavoidable collision between section 60 of the Bankruptcy Act and the floating lien created and protected by article 9 of the Commercial Code (Ore.Rev.Stat. §§ 79.2040, 79.3020, 79.4020 [U.C.C. §§ 9–204, 9–302, 9–402])?

■ Section 60a(1) of the Bankruptcy Act (11 U.S.C. § 96a(1)) defines a "preference" as (1) a transfer of any property of the debtor, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt, (4) while the debtor is insolvent, (5) within four months of bankruptcy, (6) which enables the creditor to obtain a greater percentage of his debt than some other creditor of the same class. Section 60b permits the trustee to avoid a preference if the creditor had reasonable cause to believe that the debtor was insolvent at the time of the transfer. The trustee has succeeded in having resolved in his favor all section 60 issues save two: (1) Did the Bankrupt's transfer of a security interest to Rose City occur during the four months preceding bankruptcy? (2) Was the transfer for or on account of an antecedent debt?

The validity of Rose City's floating lien on after-acquired accounts receivable arising prior to the four-month period

5. The parties used printed form No. 1208 UCC Series entitled "Accounts Receivable Loan and Security Agreement" with some modifications. Section 2.5 of the form relating to terms of payment and to the deposit of proceeds in a cash collateral account in the name of the secured party was stricken and in its place was inserted payment of $653.36 per month.

6. Counsel representing the trustee on appeal were not counsel below.

preceding bankruptcy is unchallenged. Rose City's security agreement complied with the provisions of Oregon Commercial Code section 79.2040(3) (U.C.C. § 9–204(3)) [7] and its lien was perfected by filing its financing statement in accordance with section 79.4020 of the Code (U.C.C. § 9–402).

The trustee contends that any interest Rose City claims in accounts receivable which came into existence within four months before bankruptcy is voidable as a preference because the transfer of such an interest could not have occurred earlier than the date upon which the account arose. The Commercial Code says that the debtor has no rights "[i]n an account until it comes into existence." (Ore.Rev.Stat. § 79.-2040(2) (d), U.S.C. § 9.204(2) (d).) To obtain a right, there must be a transfer to the creditor, and that transfer cannot occur, he says, until the right arose. A transfer occurring during the four months preceding bankruptcy cannot be related back to the filing of a financing statement and thus perfected before the preference period because to do so would violate the federal policy expressed in section 60.

Some ingenious theories have been spun to avoid the result to which the trustee's logic leads.[8] It is unnecessary for us to resort to any of them to reject the trustee's argument. The unarticulated premise is that Congress left to state law the definition of "transfer" and of "perfection," thereby permitting state law to control the impact of preferences. The premise is flawed. Congress itself defined these concepts leaving only some details to be brushed in by state law.

Section 60a(2) of the Bankruptcy Act provides that "a transfer of property * * * shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee."

Congress did not state that a "transfer" occurs when a security interest attaches or when state law says a conveyance has been made. Congress provided that a transfer is "deemed" to have been made when it became "so far perfected" that no subsequent lien creditor could achieve priority. "Transfer" for the purpose of section 60a(2) is thus equated with the act by which priority over later creditors is achieved and not with the event which attaches the security interest to a specific account.

We look to state law, therefore, only to decide the point at which Rose City's claim to the future accounts was sufficiently asserted to prevent a

7. The Code states that "a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement." The draftsmen's intent was to validate security interests in after-acquired property, including inventory and accounts receivable, and to place such security interests on a par with security interests in property in which the debtor has present rights. Draftsmen's Comments to U.C.C. § 9–204.

8. One theory, variously called the "res," "entity," or "Mississippi River" theory, conceives of accounts receivable as a single entity with an identity apart from the individual account components which make up the mass. The reified mass is the thing to which the creditor's lien adheres and which gives the creditor a present interest in all future accounts perfected upon filing a financing statement. Therefore, so long as the financing statement is filed before the four-month period antedating bankruptcy, the transfer is not voidable by the trustee. (*E. g.*, Manchester National Bank v. Roche (1st Cir. 1951) 186 F.2d 827; Rosenberg v. Rudnick (D.Mass.1967) 262 F.Supp. 635.)

Another theory is labeled the "sophisticated res" theory, which treats the secured creditor as having a continuously perfected security interest in after-acquired accounts as the proceeds of a previous interest in contract rights or general intangibles. The perfected interest adheres to the contract right, and not to the later performance of the right by the transfer of the after-arising account. (Coogan & Bok, "The Impact of Article 9 of the Uniform Commercial Code on the Corporate Indenture," 69 Yale L.J. 203 (1959) )

subsequent lien creditor from achieving priority over it in those accounts. That time was the date upon which Rose City filed its financing statement. (Grain Merchants of Indiana, Inc. v. Union Bank & Savings Co., Bellevue, Ohio (7th Cir. 1969) 408 F.2d 209.) Because Rose City filed its financing statement long before the four-month period anteceding bankruptcy, its security interest is immune from the trustee's preference challenge.

There is no conflict between this result and the federal policy expressed in section 60 of the Bankruptcy Act. From the inception of section 60 in 1898,[9] through its amendments, including the adoption of the present version in 1950,[10] Congress intended to achieve two aims: (1) to prevent an insistent creditor from harvesting more than his fair share of the insolvent's assets by obtaining transfers from the debtor on the eve of bankruptcy, and (2) to discourage extension of credit to debtors under circumstances which concealed from general creditors the precarious financial condition of the debtor.

The 1898 edition of the statute contained no definition of the time at which a transfer was deemed made for preference purposes. It was completely inadequate to deal with transfers by security instruments, particularly by chattel mortgages with after-acquired property clauses, in which the creditor's interest did not publicly appear until bankruptcy was imminent. Typically the debtor was given all the appearance of unencumbered ownership of his personalty upon the strength of which general creditors un-

aware of the secured creditor's lien continued to advance credit. Shortly before the insolvent's collapse, the secured creditor would take possession of the liened assets, or otherwise perfect his lien, leaving the other creditors the pickings from a nearly barren estate. Federal courts, applying the "Massachusetts rule" on perfection of liens on after-acquired property, upheld such transfers against the trustee's attacks. (Humphrey v. Tatman (1905) 198 U.S. 91, 25 S.Ct. 567, 49 L.Ed. 956; Thompson v. Fairbanks (1905) 196 U.S. 516, 25 S.Ct. 306, 49 L.Ed. 577; Petition of Post (In re Robert Jenkins Corp.) (1st Cir. 1927) 17 F.2d 555, cert. denied, Levy v. Post (1927) 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 407.) [11]

The Chandler Act amendment to section 60, enacted in 1938, was intended to prevent the drain of assets caused by the eve of bankruptcy perfections validated by *Humphrey* and *Thompson* and the equitable lien theories applied by such cases as *Robert Jenkins Corp.*[12] The 1938 version provided that a transfer was deemed made when it became so far perfected under state law that no bona fide purchaser from the debtor could obtain rights in the property superior to those of the secured creditor. The effect of the bona fide purchaser test was to invalidate as preferences legitimate financing transactions, particularly security interests in accounts receivable and inventory which involved none of the evils at which Congress aimed.[13] Congressional response was the enactment of the present lien creditor test found in section 60a(2).

9. Act of July 1, 1898, c. 541, § 60, 30 Stat. 562.

10. 64 Stat. 24, 11 U.S.C. § 96(a).

11. A helpful discussion of these cases and their relationship to the history of § 60 is found in Friedman, "The Bankruptcy Preference Challenge to After-Acquired Property Clauses Under the Code," *supra* note 2, 108 U.Pa.L.Rev. 194 (1959).

12. *See, e. g.*, Hearings Before the Committee on the Judiciary To Study Revision of the Bankruptcy Act (1937) 75th Cong., 1st Sess., ser. 9, at 121–22.

13. *Ibid.* *See also* the discussion by the House Committee considering the bill which became the 1950 version of § 60a (2). H.R.Rep.No. 1293 (1949) 81st Cong., 2d Sess.

Congress was also stirred specifically by critics of Corn Exchange Nat'l Bank & Trust Co. v. Klauder (1943) 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884, in which the Court invalidated a nonnotification assignment of accounts receivable deemed unperfected under Pennsylvania law.

Rose City's floating lien on accounts receivable was easily ascertainable by any creditor who cared to look at the financing statement. After the financing statement was filed, no creditor could reasonably have been misled into believing that Rose City's receivables would provide assets to which he could look to satisfy debts incurred for subsequent extensions of credit. Neither the Bankrupt nor Rose City took any affirmative action to obtain for Rose City a favored position over other creditors of its class during the four months before bankruptcy.

Nothing in the legislative history of section 60a(2) suggests that Congress intended to permit a trustee to upset floating liens on accounts receivable which, as here, were automatically perfected and which involved none of the symptoms of last minute favoritism characterizing true preferences. On the contrary, the history of the section shows that Congress knew how important accounts receivable financing was to the business community, particularly to small-business men, and one of Congress' principal objectives in amending section 60a(2) was to loosen the flow of credit to small-business men whose financing had been seriously impaired by the old bona fide purchaser test.[14]

If we read section 60a(2) the way the trustee asks us to do, we would defeat, not implement, Congress' intent, and we would impair, not promote, the intent of the draftsmen of the Uniform Commercial Code to make security transactions conform to the legitimate needs of commerce, rather than to the common-law lawyer's wish for conceptual nicety.[15]

The validation of Rose City's security interest and the invalidation of the claimed security interests of DuBay and Davis to which Rose City's security interest had been expressly subordinated raises the questions: (1) Did Rose City and the Bankrupt intend that accounts theretofore assigned to DuBay and Davis would become part of Rose City's security if either or both of the DuBay and Davis security interests were invalid? (2) To what extent, if at all, may the trustee preserve the senior DuBay and Davis claims for the benefit of the estate? Neither of these questions was decided below. The questions were raised before the Referee, but they were not resolved, because the Referee's invalidation of all three claims made the decision of the questions moot. The questions are to be resolved upon ultimate remand to the Referee.

The orders are affirmed and the causes are remanded for further proceedings consistent with the views herein expressed.

---

14. Hearings Before the Subcommittee on Bankruptcy and Reorganization of the Judiciary Committee of the House of Representatives (1948) 80th Cong., 2d Sess., ser. 19; Hearings Before the Subcommittee No. 2 of the Committee on the Judiciary of the House of Representatives (1949) 81st Cong., 1st Sess., ser. 7.

15. The intent of the draftsmen to insulate Rose City's security interest from preference attack is evidenced by § 9–108 of the Uniform Commercial Code (Ore.Rev. Stat. § 79.1080). The insulation is in the form of a definition designed to defeat a trustee's claim that subjection of an after-arising account to an antecedent security agreement complying with the Code is a transfer in consideration of an antecedent debt within the meaning of § 60a(1). We do not reach the question, hotly contested by the parties, whether the Commercial Code draftsmen were successful in thus defeating a claim of preference. We cite the section simply to indicate the policy of the Commercial Code draftsmen to uphold security interests in after-acquired accounts receivable perfected upon filing a financing statement against a claim of preference by the trustee.