In the Matter of MIDWEST ENGINEER-
ING CO., Inc., Bankrupt.
Owen J. REDMOND, Jr., Trustee,
Appellant,
v.
EAST SIDE NATIONAL BANK OF
WICHITA, Appellee.
No. 526–69.

United States Court of Appeals,
Tenth Circuit.
May 11, 1970.

Fred Hinkle, Wichita, Kan. (Frank W. Hylton, Wichita, Kan., with him on the brief), for appellant.

William Porter, Wichita, Kan., for appellee.

Before MURRAH, Chief Judge, and HILL and HICKEY, Circuit Judges.

MURRAH, Chief Judge.

This appeal involves the conflicting claims of a bank and a bankrupt corporation's trustee to money due the bankrupt corporation under a construction subcontract. The question before us is whether East Side National Bank holds a perfected security interest in the contractual payments; if so it is entitled to priority over the corporation's bankruptcy trustee under Section 70(c) of the Bankruptcy Act, 11 U.S.C. § 110(c).

In January of 1965, C. V. Hickman, doing business as Midwest Engineering Company, received a construction subcontract from Snodgrass & Sons Construction Co., Inc. and by written agreement assigned the money to become due under the subcontract to the bank as collateral for a loan. Under the law of Kansas prior to the effective date of the Uniform Commercial Code, an assignee of an account receivable protected his assignment from the claims of third parties by filing a notice of assignment with the Kansas Secretary of State, K. S.A. 58–801 to 58–807. On January 28, 1965, the bank complied with this requirement by filing a notice form which protected the assignment for one year. K.S.A. 58–803.

Before commencing work on the subcontract Hickman incorporated his business as Midwest Engineering Co., Inc. and became that corporation's president. As the work progressed Midwest, Inc. executed promissory notes to the bank, reflecting the bank's continuing advances. Among these were a demand note in the amount of $12,338.88 and an attached security agreement, both dated December 16, 1965. The security agreement was signed by Hickman in his individual and corporate capacities and granted a security interest in the following property:

"Assignment of moneys due or to become due as evidenced by assignment and acceptance of assignment dated 1/19/65 from Snodgrass and Sons Construction Company, Inc. and signed by Victor M. Schimming, Sec.-Treas."

Although the Code did not become effective in Kansas until midnight of Decem-

ber 31, 1965, the security agreement provided:

"The rights, duties and obligations hereunder of the Bank and the undersigned shall, unless otherwise required by law, be governed by the provisions of the Uniform Commercial Code as in effect from time to time in the State of Kansas and other laws of the State of Kansas, or the laws in the State where filed."

The bank did not file the renewal notice form required by the pre-Code statute, K.S.A. 58–801 to –807, and the assignment lost its protection under that statute after January 28, 1966. On February 1, 1966, however, the bank filed a financing statement meeting Code requirements and covering:

"Accounts Receivable, Automobiles, Trucks, Equipment, Inventory, and Contracts receivable."

During the performance of the contract the bank loaned Midwest, Inc. a total of $68,668.22 on the security of the assignment and received payments from Snodgrass totaling $59,268.58.

Involuntary bankruptcy proceedings were initiated against Midwest, Inc. on March 15, 1967, at which time Snodgrass still owed $8,790.61 on its subcontract with Midwest, Inc. This sum was paid into court and the bankruptcy referee ordered it turned over to the trustee rather than to the bank. On review the District Court reversed the referee and ordered the money paid to the bank. The court held that the referee's conclusion that no security agreement existed between Midwest, Inc. and the bank was clearly erroneous in light of the December 16th agreement and further held that the parties could create a valid security agreement under the Code on that date. Finally, the court was of the opinion that the security interest created by that agreement was perfected under the Code by the filing of a financing statement on February 1, 1966.

■ We affirm the judgment of the District Court, although for slightly different reasons. It was clearly erroneous for the referee to conclude, in the face of the December 16th agreement, that Midwest, Inc. and the bank had not executed a security agreement. The sixteenth of December agreement did anticipate the applicability of the Code; but unlike the agreement in Scott v. Stocker, 380 F.2d 123 (10th Cir. 1967), it also fully complied with pre-Code law, K.S.A. 58–804(1); and the parties do not contend to the contrary. We thus have no need to decide whether the parties could contract concerning the applicability of the Code before its effective date. Cf. Scott v. Stocker, supra. It is quite sufficient that, at least as between the parties, the pre-Code agreement was valid when made and continued to exist, notwithstanding the subsequent enactment of the Code. This result is mandated by the Code itself, which specifically provides:

"Transactions validly entered into before the effective date specified in section 417 [from and after midnight December 31, 1965] and the rights, duties and interests flowing from them remain valid thereafter and may be terminated, completed, consummated or enforced as required or permitted by any statute or other law amended or repealed by this act as though such repeal or amendment had not occurred." K.S.A. 84–10–102(2).

■■ We also agree with the District Court that the security interest created, as it was, under pre-Code law could be and was perfected under the Code. The referee took the position that inasmuch as the transitional section, Section 84–10–102(2), validated the pre-Code security interest, it necessarily governed the manner in which the interest was to be protected from the claims of third parties. And not having been perfected in accordance with pre-Code law, the security interest is ineffective

as to third parties. We think the referee's reasoning unduly restricts the transitional provision of the new Code, the salient purpose of which was to facilitate the advent of the Code without impairment of vested rights under pre-Code law. True, the parties may "terminate, complete, consummate or enforce" their transactions under pre-Code law.[1] But this does not mean that the language of the section should be construed to make pre-Code law the exclusive mode of protecting pre-Code rights.

We think it is significant that the transitional language of the Code does not require compliance with the notice provisions of pre-Code law.[2] Notice under the Code is quite as effective as notice under the pre-Code law. Indeed, the old and new statutes are remarkably similar in requiring the filing of a notice form with the Kansas Secretary of State. An appropriate inquiry at the office of the Secretary would reveal the filing under either law. To require technical compliance with pre-Code law would be a slavish adherence to form where form serves no salutary purpose but instead operates to deny substantial justice. See Lynch v. County Trust Co., 404 F.2d 1149 (2d Cir. 1968) (applying Section 10–102(3) (b), a similar but more specific section of the New York Uniform Commercial Code). The judgment is accordingly affirmed.

1. See, e. g., In re Tuttle, 5 UCC Rep. Serv. 424 (E.D.Mich.1968) (Renewal of chattel mortgage permitted under pre-Code law which required no signature of mortgagee on chattel mortgage for filing, unlike the Code) ; In re Kokomo Times Pub. & Printing Co., 301 F.Supp. 529 (S.D.Ind.1968) (Pre-Code security interest arising from conditional sales contract is perfected by pre-Code law, which required no filing, rather than by Code filing.)

2. Two opinions of the Kansas Attorney General suggest that the Secretary of State of Kansas would not have accepted the old renewal notice form for filing once the Code became effective. Op. Att'y Gen. Kan. (Feb. 15, 1966), reported in 3 UCC Rep.Serv. 926 ; Op. Att'y Gen. Kan. (Nov. 15, 1965), reported in 3 UCC Rep.Serv. 98. Other state attorneys general have concluded that the Code gives the parties a choice concerning the method of filing. See Op. Att'y Gen. Fla. (No. 066–104 Nov. 10, 1966), reported in 3 UCC Rep.Serv. 1180; Op. Att'y Gen. Minn. (No. 373b June 24, 1966), reported in 3 UCC Rep.Serv. 749; Op. Att'y Gen. Neb. (No. 109–65 Sept. 13, 1965), reported in 3 UCC Rep.Serv. 107; Op. Att'y Gen. Md. (Feb. 5, 1964), reported in 2 UCC Rep.Serv. 22.