In re Patrick William SEALY and Zora Kay Sealy, Debtors.

John C. McLEMORE, Trustee, Plaintiff,

v.

CARSON LTD., Defendant.

Bankruptcy No. 282–00513.

Adv. No. 282–0379.

United States Bankruptcy Court, M.D. Tennessee.

Nov. 23, 1983.

John C. McLemore, McMackin, Garfinkle & McLemore, Nashville, Tenn., for plaintiff.

C. Kinian Cosner, Jr., Cosner & Waldschmidt, Nashville, Tenn., for defendant.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The question presented is whether a "layaway" agreement on the back of a sales receipt creates a security interest where goods are delivered to the buyer at the time of sale but later returned to the seller. Secondarily, if the layaway agreement is insufficient to create a security interest, can the goods in the seller's possession be recovered by a trustee under § 547 if the return was within 90 days of bankruptcy? After consideration of the exhibits, stipulations and applicable authority, the court concludes that the seller did not retain an enforceable security interest in the property, that the debtors' return of the property constituted a preference, and that the trustee may recover the property and sell it for the benefit of all creditors.

The following are findings of fact and conclusions of law required by Rule 7052 of the Bankruptcy Rules.

The trustee seeks to recover three rings purchased by the debtors in three separate transactions. On October 20, 1980, Patrick Sealy ("Sealy") purchased a solitaire diamond ring from Carson, Ltd. ("Carson"), a Cookeville, Tennessee jewelry retailer, for $1,260.03. On December 15, 1980, Sealy purchased a one-half carat man's ring from Carson for $1,317.50 and on June 28, 1981, Sealy purchased a one-half carat diamond ring guard for $784.55. On February 22, 1982, the Sealys filed a Chapter 7 petition. The Sealys scheduled Carson as a secured creditor.

On June 16, 1982, the trustee filed a complaint against Carson and the Sealys to recover the rings and to avoid Carson's alleged lien. The debtors filed an answer stating that prior to the filing of the complaint they had returned the rings to Carson. The proof is contradictory as to whether the rings were returned pre-bankruptcy or post-bankruptcy. Zora Sealy's affidavit states that "after filing our bankruptcy petition [on February 22] but prior to the meeting of creditors on March 31, 1982, I discussed our bankruptcy with Terry Eldridge Newton, an employee for Carson, Ltd. and attempted to negotiate a reaffirmation agreement." She further states "[w]e were unable to reach an agreement regarding this matter and upon advice of counsel, my husband's rings were returned to Carson, Ltd. on or about March 15, 1982. My wedding rings were subsequently returned to Carson, Ltd. on or about March 24, 1982." Zora Sealy's affidavit conflicts

with the affidavit of Allen Gregory, treasurer of Carson, which states that Patrick Sealy returned the rings during the first week of February, approximately three weeks prior to filing bankruptcy. The trustee dismissed the complaint against the debtors on November 10, 1982.

On December 17, 1982, the trustee amended his complaint to assert that if the rings were returned pre-bankruptcy as claimed by Carson, the transfer constituted an avoidable preference under 11 U.S.C.A. § 547 (West 1979). The matter was submitted to the court on briefs, affidavits, and stipulations on June 28, 1983.

## I. RETENTION OF SECURITY INTEREST

■ The trustee argues that Carson neglected to retain a security interest in the rings and, therefore, the trustee has superior rights in the rings under 11 U.S.C.A. § 544 (West 1979).[1] Carson asserts that it retained a purchase money security interest in all three rings.[2]

TENN.CODE ANN. § 47–9–203(1)(b) (1979) provides that a security interest is not enforceable against either the debtor or a third party unless "the debtor has signed a security agreement which contains a description of the collateral." TENN.CODE ANN. § 47–9–105(h) (1979) defines "security agreement" as an agreement "which creates or provides for a security interest." While the enactment of Article 9 has eliminated many of the technical and archaic requirements for the creation of a security interest imposed at common law, certain minimum requisites must still be satisfied.

---

**1.** On the date the bankruptcy petition is filed, the trustee acquires the rights of a hypothetical lien creditor. 11 U.S.C.A. § 544(a) (West 1979) provides in relevant part that:

The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of

the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists.

**2.** There is no dispute that if a security interest was created it was a purchase money security interest within the meaning of TENN.CODE ANN. § 47–9–107 (1979) and as such is perfected without filing. TENN.CODE ANN. § 47–9–302(1)(d) (1979).

Judge Jennings of this court reviewed the elements of a security agreement in *Cookeville Production Credit Association v. Frazier,* 16 B.R. 674, 678 (Bkrtcy.M.D.Tenn.1981):

A security agreement must contain the following elements:

1. an agreement which creates or provides for a security interest [T.C.A. 47–9–105(1)(h) ];

2. the debtor's signature [T.C.A. § 47–9–203(1)(b) ];

3. a description of the collateral [T.C.A. § 47–9–203(1)(b) ];

4. a description of the land concerned, where the collateral is crops or oil, gas or minerals to be extracted or timber to be cut. [T.C.A. § 47–9–203(1)(b) ].

If these elements are found in an instrument or document then there is a security agreement, valid and enforceable between the parties. T.C.A. § 47–9–203(1)(b).

*See* UNIFORM COMMERCIAL CODE COMMENTARY AND LAW DIGEST, ¶ 9–203[A][6], 9–97 (1978). Most courts and commentators interpreting §§ 9–203 and 9–105 of the Uniform Commercial Code have concluded that a security agreement is valid and enforceable only if it contains language specifically creating or retaining a security interest in described collateral. *See, e.g., Transport Equipment Co. v. Guaranty State Bank,* 518 F.2d 377, 380 (10th Cir.1975); *Shelton v. Erwin,* 472 F.2d 1118, 1120 (8th Cir.1973); *Daily v. Associates Financial Services Corp. (In re Walter W. Willis, Inc.),* 313 F.Supp. 1274, 1277–1278 (N.D.Ohio 1970) *aff'd,* 440 F.2d 995 (6th Cir.1971); *Dubay v. Williams,* 417 F.2d 1277, 1285 (9th Cir.1969); *Mid-Eastern Electronics, Inc. v. First National Bank,* 380 F.2d 355, 356 (4th Cir.1967); 4 Anderson, UNIFORM COMMERCIAL CODE 157 (2d ed. 1971). *See contra* 1 Gilmore, SECURITY INTERESTS IN PERSONAL PROPERTY, § 11.4 at 347–348 (1965).

Carson alleges its security interests were created by receipts tendered to the debtors each time a ring was purchased. The court rejects Carson's contention that these receipts are sufficient to create an enforceable security agreement. The front of each receipt provides for the name and address of the purchaser, the date of the transaction, a description of the item purchased, and is signed by "Pat Sealy." The reverse side of the receipts is titled "LAYAWAY AGREEMENT." The agreement contains blank spaces for insertion of information as follows:

I understand this merchandise will be held for me and I agree to pay the balance due by _____. I agree to pay $_____ every [week or month]. I understand that if the merchandise is not fully paid for and called for on or before _____ it will be returned to stock unless special arrangements are made.

Carson relies on the language "I understand this merchandise will be held for me," to assert the retention of a security interest. This language, however, is nothing more than a layaway purchase option offered by Carson. In the layaway purchase situation, the seller retains possession of the merchandise until payment is made. The layaway agreement has no obvious application in the context of an outright sale. The transactions at issue in this case were sales not layaways. One of the "layaway agreements" was partially completed to reflect a monthly payment of $100 and 1½% interest on the unpaid balance. However, there is no language suggesting a retention of title by the seller or any condition on the sale which might constitute a security agreement. If Carson intended the layaway agreement to mean something different from its plain language, Carson had the burden of proving the circumstances or other intentions of the parties. *See Roberts Furniture Co. v. Pierce (In re Manuel),* 507 F.2d 990, 993 (5th Cir.1975); *Delwood Furniture Co. v. Williams (In re Metzler),* 405 F.Supp. 622, 625 (N.D.Ala.1975); *Landaus of Plymouth, Inc. v. Scott,* 5 B.R. 37, 39 (Bkrtcy.M.D.Pa.1980). Carson offered no proof that the parties contemplated that this language had any special significance or that the debtor acknowledged the language for any purpose other than as a sales contract. As one commentator explains, a

provision in a sales contract fixing installment payments is generally insufficient by itself to establish a security agreement:

> All selling "on time" is not the same. The common understanding is that the buyer loses his rights to the merchandise if he fails to keep up his payments. This, however, is not always the case. . . . [I]t is just possible that there has been a straight sale on credit with a stretched-out payment schedule . . . If the buyer fails to pay up as promised, the seller is simply another unsecured creditor and must proceed accordingly. He has no special claim on the merchandise he sold even though it has not yet been fully paid for. Should the seller want to reclaim the merchandise on default, the "agreement" must technically fit the 9–105(a) description of a "security agreement." The heart of this agreement is not the deferred payment schedule but the provision that covers the seller's retention of "an interest in personal property . . . (to) secure payment" (1–201(37)). To put it another way, the buyer and seller must agree to share "property" rights in the goods sold. Failing this, the seller retains no "security interest" in the merchandise sold, much less a perfected security interest in that merchandise.

UNIFORM COMMERCIAL CODE COMMENTARY AND LAW DIGEST, 9–96–97, ¶ 9–203[A][6] (1978).

This case is similar to *In re Nottingham,* 6 U.C.C.REP.SERV. 1197 (E.D.Tenn.1969). In *Nottingham,* a retailer received a down payment and the buyer's agreement to pay the outstanding balance in installments. The retailer also received a signed "buyer's credit statement," a sales contract, and a promissory note. The buyer filed bankruptcy and the trustee asserted that the instruments contained no words indicating the seller's retention of title. Bankruptcy Judge Bare sustained the trustee's position as follows:

> A careful reading of the document relied upon by the seller in this case discloses no words that can reasonably be construed or interpreted as retaining title to the property in the seller or any words creating or providing a security interest therein. One-half of the document is the "Buyer's Credit Statement" which furnishes information concerning his residence, employment, bank accounts, et cetera. The second half is designated "Sales Contract Including Promissory Note," and recites that the seller has sold to the buyer a color television set, reflects the cash sale price, down payment, time price differential, and time sales price, together with other provisions for payment of delinquency charges and attorney fees. It also provides for monthly payments of $26.35 each for 21 months beginning August, 1968. In other words, the document is exactly what it says it is—a sales contract and promissory note. It is neither a title retention contract nor a conditional sales contract. It does not create or provide for any security interest in the property. It is therefore my conclusion that such document does not meet the requirements of a security agreement.
>
> There are no magic words that create a security interest. There must be language, however, in the instrument which when read and construed leads to the logical conclusion that it was the intention of the parties that a security interest be created. Just as the ancient mariner found water water everywhere but not a drop to drink, the seller in this case uses words and words but none that create a security interest. The requirements of the Code for creating a security interest are simple—an intention to create a security interest is all that need be shown—a dozen words or less are sufficient, but the security agreement must contain language that meets this simple requirement.

*Nottingham,* 6 U.C.C.REP.SERV. at 1198–99.

The second and third ring receipts are additionally deficient as security agreements because the reverse side of the receipt is not signed by the debtor. Although the debtor signed the "received by" blank on the front, the debtor did not sign the back of these two receipts containing the

language relied upon by Carson. As the Georgia Court of Appeals noted in *Food Service Equipment Co. v. First National Bank:*

> We do not believe the defendant received a signed security agreement from the debtor ... where the only signing appears on the face of the instruments. The placing of initials or signatures on the face shows nothing more than acknowledgment of receipt of the equipment. Furthermore, neither the sale order nor the delivery receipt makes any reference to the reverse side of the documents. Not only are the title-retention contracts devoid of any symbol which can be construed as being signed by the parties, but [the parties] did not complete any one of the vital blank spaces in the printed form, which if completed, might have given legal significance to an otherwise blank piece of paper. In short, the parties had no security agreement whatsoever.

121 Ga.App. 421, 174 S.E.2d 216, 7 U.C.C. REP.SERV. 878, 880, *cert. denied,* 4 U.C.C. L.L. 7 (1970).

## II. PERFECTION BY POSSESSION

■ Carson argues in the alternative that even if it did not retain an enforceable purchase money security interest when the rings were originally purchased, it obtained a perfected possessory security interest prior to bankruptcy when the debtors voluntarily returned the rings. TENN.CODE ANN. § 47–9–203(1)(a) (1979) provides that a security interest is enforceable against the debtor and third parties if "the collateral is in the possession of the secured party."[3] TENN.CODE ANN. § 47–9–305 states that a security interest in goods "may be perfected by the secured party's taking possession of the collateral." Carson argues through the affidavit of Allen Gregory that it acquired possession in the first week of February, three weeks prior to the filing of bankruptcy. The trustee denies that Carson obtained possession prior to bankruptcy and submits Zora Sealy's affidavit that the rings were not returned until late March, one month after bankruptcy.

The court finds that the rings were returned after bankruptcy. Zora Sealy's affidavit is more persuasive in the context of this case. The debtors have been released from liability and have no interest in the outcome of this litigation. Zora Sealy had personal knowledge of the events surrounding the bankruptcy and the return of the rings. Gregory did not become involved until this litigation commenced and does not claim any personal knowledge of the events. Carson proffered no affidavit from Tracy Newton, the store employee with whom the Sealys actually dealt. The debtors scheduled Carson as a creditor for the full amount of the outstanding indebtedness—consistent with the debtors' claim that they returned the property after preparing the petition and schedules. The court finds that Carson did not acquire possession until after the bankruptcy and that the trustee's interest in the property is superior under 11 U.S.C.A. § 544 (West 1979).

## III. AVOIDABLE PREFERENCE

■ Even if the court accepts Carson's proof that the rings were returned prior to bankruptcy, the trustee may avoid the transfer of possession to Carson as a preference. 11 U.S.C.A. § 547(b) (West 1979) provides that:

> (b) The trustee may avoid any transfer of property of the debtor—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—

---

**3.** Neither party has addressed the question whether an oral security agreement is a prerequisite to enforceability under § 47–9–203(1)(a). *See Barton v. Chemical Bank,* 577 F.2d 1329, 1334 (5th Cir.1978). Carson presented no proof of such an oral agreement and, as indicated above, no writing exists sufficient to constitute a security agreement. However, the outcome of this case would not be changed by proof of an oral security agreement.

(A) on or within 90 days before the date of the filing of the petition;

\* \* \* \* \* \*

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The trustee bears the burden of proof on each of these elements. *Waldschmidt v. Ford Motor Credit Co. (In re Murray)*, 27 B.R. 445, 447 (Bkrtcy.M.D.Tenn.1983). *See also Steel Structures, Inc. v. Star Manufacturing Co.*, 466 F.2d 207, 216 (6th Cir.1972). The court finds that all the elements of an avoidable preference have been demonstrated. The return of the rings constituted a transfer.[4] The transfer was made to and for the benefit of Carson, a creditor. The transfer if sustained would allow Carson to acquire a perfected security interest on the eve of bankruptcy and, thereby to receive a greater share of the bankruptcy estate than if the transfer had not been made. The transfer was made to satisfy antecedent debts. Considering the evidence in the light most favorable to Carson, the transfer was made no more than 21 days prior to the filing of the petition while the debtor was contemplating bankruptcy and was insolvent.[5]

Accordingly, the trustee is entitled to recover the rings under either 11 U.S.C.A.

§ 544 (West 1979) or 11 U.S.C.A. § 547 (West 1979) and sell the rings for the benefit of all creditors.

An appropriate order will be entered. Entered this 23rd day of November, 1983.

---

**4.** 11 U.S.C.A. § 101(41) (West 1979) provides: 'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, disposing of or parting with property or with an interest in property, including retention of title or security interest.

**5.** 11 U.S.C.A. § 547(f) (West 1979) creates a rebuttable presumption regarding the debtors' insolvency for the purpose of proving a preference:

(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately proceeding the date of the filing of the petition.

This presumption requires the party against whom the presumption exists to come forward with rebuttal evidence. *Waldschmidt v. Ford Motor Credit Co. (In re Murray)*, 27 B.R. at 447, *In re Rustia*, 20 B.R. 131, 133 (Bkrtcy.S.D.N.Y. 1982); *Seidle v. Kwik Copy, Inc. (In re Belize Airways Ltd.)*, 18 B.R. 485, 487 (Bkrtcy.S.D.Fla. 1982). Carson proffered no evidence to rebut the presumption. It should also be noted that Carson has not pleaded any of the defenses described in § 547(c), thus the availability of any defense under that subsection is not addressed.