In re TENNESSEE WHEEL AND RUBBER COMPANY, Debtor.

TENNESSEE WHEEL AND RUBBER COMPANY, Plaintiff,

v.

Thomas E. STREET, Defendant.

Bankruptcy No. 384–01237.
Adv. No. 385–0375.

United States Bankruptcy Court,
M.D. Tennessee.

July 29, 1986.

See also, Bkrtcy., 64 B.R. 721.

Randall S. Mashburn, Jennings, Derrick & Mashburn, Nashville, Tenn., for plaintiff.

James N. Bryan, Jr., Barrett & Bryan, Nashville, Tenn. for defendant.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

In this preference action the issues are: (1) whether the defendant was an insider; and (2) whether the defendant had reasonable cause to believe the debtor was insolvent.[1] I find in the affirmative on both issues.

The following constitute findings of facts and conclusions of law. Bankr.R. 7052. This is a core proceeding. 28 U.S.C. § 157(b)(2)(F) (1984).

### I.

On August 22, 1983, Thomas E. Street ("Street") loaned the debtor, Tennessee Wheel and Rubber Company ("Tennessee Wheel"), $30,000 to be repaid with interest on September 2, 1983. At the time, Street was president of the debtor. On September 9, 1983, Tennessee Wheel repaid Street $30,117.54. Tennessee Wheel filed its Chapter 11 petition on May 4, 1984. The debtor seeks to recover the $30,117.54 payment as a preference. 11 U.S.C. § 547(b) (1982 ed.).[2]

### II.

Tennessee Wheel hired Street as its president and chief executive officer in April, 1982. Michael Getchell ("Getchell"), Tennessee Wheel's majority stockholder, convinced Street to join the company and negotiated the employment contract.

Street is an educated businessman. He is a college graduate with "extensive" course work and postgraduate seminar and workshop experience in business supervision, management and sales. He has worked in managerial and supervisory positions for over 30 years and serves on financial and audit committees for several organizations. He is trained in the analysis of financial information and is familiar with the use of profit and loss statements, income statements and related financial reports.

Street commenced duties as president of Tennessee Wheel in May of 1982 and exercised management prerogatives at least until the end of 1983. During his first two months at Tennessee Wheel, Street pre-

---

1. The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 369 (1984) ("BAFJA") eliminated the "reasonable cause to believe" requirement from 11 U.S.C. § 547(b)(4)(B). The parties have stipulated that prior law applies to this proceeding.

2. 11 U.S.C. § 547(b) (1982 ed.) provides in part:
 [T]he trustee may avoid any transfer of property of the debtor—
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 . . . .
 (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—
 (i) was an insider; and
 (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
 (5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 The trustee bears the burden of proof. *Waldschmidt v. Ford Motor Credit Co. (In re Murray)*, 27 B.R. 445, 447 (Bankr.M.D.Tenn.), aff'd, 33 B.R. 112 (M.D.Tenn.1983); *McLemore v. Carson Ltd. (In re Sealy)*, 34 B.R. 947, 952 (Bankr.M.D.Tenn.1983).

pared the company's internal financial statements. He received copies of most of the company's income statements and balance sheets through March 31, 1983. He received daily sales summaries throughout his involvement with the company. He signed internal memoranda, corporate correspondence, checks and financial statements. He approved hiring and salary decisions, made salary advances and supervised employees. He hired at least one sales person in the fall of 1983 and reviewed corporate opportunities including the purchase of other companies late in 1983. He convinced venders to do business with Tennessee Wheel during 1983. He was always paid his contractual salary as president and received the benefits prescribed in the original contract.

In January, 1983, Getchell negotiated a $500,000 line of credit for Tennessee Wheel with First American National Bank ("FANB"). Getchell introduced Street to Gary Howlett, FANB's lending officer. Howlett reasonably perceived Street to be the president, chief operating officer and primary manager of Tennessee Wheel. Street gave Howlett no cause to believe otherwise at least until the spring of 1984.

On January 27, 1983, Tennessee Wheel secured the $500,000 line of credit at FANB with the debtor's inventory, accounts, contract rights and general intangibles. Street signed the security agreement and promissory note as president and CEO of Tennessee Wheel. Exhibit 8.

In June, 1983, Tennessee Wheel requested additional financing from FANB. The *REQUEST FOR ADDITIONAL LOAN AVAILABILITY*, Exhibit 9, states that Tennessee Wheel was experiencing cash flow problems due to unexpected costs and delays in renovation of its offices and plant and the delayed installation and operation of new equipment. The loan request was signed by Street and Getchell.

The additional loan request was negotiated by Howlett for the bank and Street for Tennessee Wheel. In support of its request, Tennessee Wheel submitted an unaudited balance sheet dated March 31, 1983. Street signed and verified this balance sheet. Howlett and Street discussed Tennessee Wheel's financial condition. Street explained new programs, new products and marketing strategies he was implementing as president and the expected impact on Tennessee Wheel's cash flow.

During this negotiation, Howlett asked Street for additional information about "extended" accounts receivable shown as assets on the March 31 balance sheet. Street inquired of Tennessee Wheel's bookkeeper and determined that approximately $500,000 of the extended receivables represented to the bank were "bogus" and did not exist. Street did not inform the bank that the "verified" balance sheet was false. Street caused additional information—including "addresses" for the false receivables—to be supplied to the bank. He then took a two-week sales trip.

Upon his return, Street sought the advice of an attorney. On counsel's advise, a letter of resignation was prepared, signed by Street and mailed to Getchell and the directors of Tennessee Wheel on June 28, 1983. Exhibit 13. After discussing the matter with Getchell, Street withdrew this letter of resignation. At Street's request, the letters sent to the directors were retrieved unopened. Street resubmitted this letter of resignation on July 29, 1983 after Getchell questioned Street's authority to hire and fire salesmen. Getchell and Street resolved this misunderstanding and Street again withdrew his resignation.

In early August, 1983, FANB approved the additional loan authorization. This approval was contingent on FANB's receipt of audited financial statements for the year ending March 31, 1983. On August 9, 1983 Street, as president and CEO of Tennessee Wheel, signed a $1.6 million demand note in favor of FANB. Exhibit 11. This note included the increased loan authorization but the increase was not funded until early September due to delays in the auditing process. Street knew of the audit contingency and of the ongoing audit. He participated in the audit but did not tell the auditors that Tennessee Wheel's books had

been altered to show more than $500,000 of false accounts.

On the eve of completion of the audit and funding of the new loan, Tennessee Wheel ran out of cash for operations. To meet payroll, Street loaned the company $30,000 on August 22, 1983. Street contemplated this loan would be repaid from the extended line of credit. FANB funded its loan increase the first week in September and Street was repaid the $30,000 with interest on September 9, 1983. The parties have stipulated that on the date of repayment, Tennessee Wheel was insolvent[3] and that the repayment enabled Street to receive more than he would have received if the case were one under Chapter 7, the transfer had not been made and Street had received payment for the debt to the extent provided by the Code. Stipulations 27 and 29. There is no dispute that the payment to Street was a transfer of the debtor's property, to or for a creditor's benefit, on account of an antecedent debt, made between 90 days and one year before the filing of the petition. The defendant disputes only two elements of this preference action: whether Street was an insider and whether he had reasonable cause to believe Tennessee Wheel was insolvent at the time of the transfer.[4]

### III.

■ The Code does not provide a static definition of insider. By way of example, it provides that directors, officers or persons in control of a debtor corporation are insiders. 11 U.S.C. § 101(25)(B) (1982 ed.).[5] H.REP. NO. 595, 95th Cong., 1st Sess. 312 (1977) *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5787, 5963, 6269. ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.") *See* 11 U.S.C. § 102(3) (1982 ed.). An insider is one who does not deal at arms-length with the debtor. *See Carlson v. Farmers Home Administration (In re Newcomb),* 744 F.2d 621, 625 n. 4 (8th Cir.1984); *Loftis v. Minar (In re Montanino),* 15 B.R. 307, 310, 4 COLLIER BANKR. CAS.2d (MB) 362, 366 (Bankr.D.N.J.1981). The insider relationship must exist on the date of the transfer. *McWilliams v. Gordon (In re Camp Rockhill, Inc.),* 12 B.R. 829, 834, 7 BANKR.CT.DEC. (CRR) 1134, 1136, 4 COLLIER BANKR.CAS.2d (MB) 1059, 1064 (Bankr.E.D.Pa.1981); *but see DeRosa v. Buildex, Inc. (In re F & S Central Mfg. Corp.),* 53 B.R. 842, 849 (Bankr.E.D.N.Y.1985) (insider who arranged transfer remains an insider at the time of transfer).

■ Street was an insider at the time of this $30,000 transaction with the debtor. Street was the president of Tennessee Wheel in August of 1983. He had been advised by his attorney to resign as an officer of the corporation to distance himself from the fraudulent loan application but Street voluntarily disregarded counsel's advice and withdrew his resignation. Street renewed that resignation less than a month before the $30,000 loan when Getchell interfered with his presidential prerogatives but again withdrew his effort to resign the presidency. During 1983, Street acted as president of Tennessee Wheel in internal affairs of the corporation[6] and in

---

3. Tennessee Wheel was dramatically insolvent on the date of Street's $30,000 loan to the company and on the eve of the additional advance from FANB. David Bennett, an accountant qualified as an expert at trial, demonstrated nearly $2.5 million in adjustments necessary to reflect a true financial picture for the company in August of 1983. With this adjustment, Tennessee Wheel was insolvent by the balance sheet test by approximately $1.1 million. Stipulation 27.

4. Street raised two affirmative defenses in pretrial proceedings, both of which were abandoned by counsel at trial.

5. The 1984 Amendments renumbered this provision. It may now be found at 11 U.S.C. § 101(28) (Supp. II 1984).

6. One example of Street's continuing exercise of presidential authority during this period was his refusal to approve payments of fees to a putative "long range planner" named Abramowitz retained by Getchell. Street explained at trial that large payments to Abramowitz were wrong

its external dealings with banks, suppliers and customers. Characteristic of an insider, he had access to special information about Tennessee Wheel that was available only to the inner circle of managers at the company and he controlled the flow of that information to those outsiders who dealt with Tennessee Wheel.[7] Street's claim that Getchell "deposed" him as president in 1982 is not supported by the evidence.[8] The evidence overwhelmingly demonstrates that Street's relationship to the debtor was significantly closer than those who dealt with it at arms-length and sufficiently close that his conduct should bear close scrutiny. *See DeRosa,* 53 B.R. at 848 (the control exercised by an insider need not be absolute).

## IV.

 Street knew that Tennessee Wheel was in serious financial difficulty at the time of this $30,000 loan and he had knowledge of facts and circumstances sufficient to put any person of ordinary prudence and discretion upon notice and further inquiry.[9]

 Street knew at the time of his loan that the company had no cash to meet its payroll and other expenses of operation.[10] He knew that nearly half a million dollars of fake accounts receivable had been added to the books of Tennessee Wheel and falsely represented to be assets of the company in loan documents presented to FANB. Street knew that this false information had not been revealed to the bank or to the auditors who were examining Tennessee Wheel's books. Street knew that the financial statements, balance sheets and other financial information generated by the company were altered and unreliable.[11] Street knew that Tennessee Wheel was experiencing great difficulty producing product and

and he refused to authorize or sign the checks involved.

7. In addition to his knowledge of the fraudulent accounts receivable and the false documents given to FANB, Street had knowledge and use of many internal corporate documents including daily sales records, daily shipping records, account ledger cards, financial statements, checks and internal memoranda.

8. In July of 1982, soon after Street assumed the presidency of Tennessee Wheel, Getchell encountered legal and medical problems involving the use of controlled substances. Getchell spent a substantial period of time removed from corporate affairs including hospitalization at a drug rehabilitation facility. During this early period of his presidency, and in Getchell's absence, Street was essentially in charge of all aspects of Tennessee Wheel's business. When Getchell again focused on Tennessee Wheel, there was some friction between Street and Getchell as Getchell reasserted some responsibility for operation of the company. Street continued to function as president notwithstanding Getchell's return. Street acted as president in corporate affairs and held himself out to the public as president of the company at least until late 1983.

9. Whether an insider had reasonable cause to believe a debtor was insolvent is a question of fact. *Emporia Loan & Investment Co. v. Rees,* 66 F.2d 225, 226 (10th Cir.1933) (Act case).

Reasonable cause may be shown by circumstantial evidence. *Montanino,* 15 B.R. at 311. If the insider had knowledge of facts sufficient to put a person of ordinary prudence and discretion upon further inquiry, then the insider is properly charged with the knowledge that diligent inquiry would disclose. *See Grant v. First National Bank of Monmouth, Illinois,* 7 Otto 80, 82, 97 U.S. 80, 82, 24 L.Ed.2d 971, 972 (1878); *C.A. Swanson & Sons Poultry Co. v. Wylie,* 237 F.2d 16, 19 (9th Cir.1956); *Emporia Loan,* 66 F.2d at 226; *McWilliams,* 12 B.R. at 834 (citing cases); *Montanino,* 15 B.R. at 311.

10. Street had been served with warrants from the General Sessions Court for Davidson County, Tennessee, indicating that Tennessee Wheel had failed to pay its insurance premiums and was being sued by the insurance company.

11. In addition to the fake accounts receivable, during the early months of 1983 when Street admits that he was receiving and reviewing the internal financial statements, substantial new assets appear suddenly on the balance sheets for the company. "Dies and molds" which do not appear on earlier financial statements materialize in the spring of 1983 with a substantial impact on the paper worth of the company. Even an untrained superficial review of the financial statements of the company reveals glaring questions and inconsistencies. Street was not untrained nor can he claim lack of knowledge of the suspicious information contained in these internal financial documents.

making deliveries to customers. This he asserted as a reason for the additional loan request to FANB. At the same time that Tennessee Wheel was unable to meet its customers' orders, Street was aware of financial statements purporting to report glowing sales and revenues.[12] Street knew that Tennessee Wheel was otherwise engaged in questionable financial practices.[13]

It is my conclusion that Street was acutely aware from many sources of Tennessee Wheel's desparate financial condition at the time of his $30,000 loan to the company. Having already signed the new note at FANB and knowing that the fraudulent accounts receivable were not known to the bank or to the auditors, he was confident that FANB would soon advance new funds to repay this $30,000. Other creditors who dealt with Tennessee Wheel during this period were not so fortunate. Street is required by the Bankruptcy Code to return to this estate the preference he engineered for himself.

---

**12.** For example, the January 31, 1983 income statement shows monthly sales for Tennessee Wheel of $451,000. Street admits that he received this financial statement and that he also had knowledge of the daily shipping records and daily sales records for the company. The daily shipping and sales records demonstrate that in January of 1983 Tennessee Wheel was disabled in its efforts to sell, ship and deliver goods. The monthly sales reports for January cannot survive even superficial comparison to the financial statement for that same month.

Bennett testified that a "perfunctory, cursory review" of the financial records of Tennessee Wheel would have revealed to an ordinary businessman the need for further examination of the internal records of Tennessee Wheel. Bennett cited suspicious and unexplained increases in the volume of accounts receivable, the value of inventory and the value assigned to assets of the company which appear on Tennessee Wheel's books and internal financial records in late 1982 and early 1983. Bennett's analysis was based on Tennessee Wheel's records, computer runs, ledgers and annual statements—all of which were available to Street and many of which were actually known and used by him.

**13.** *See* fn. 6 *supra.*